UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN P. KELMENDI,

     Plaintiff,

v.

DETROIT BOARD OF EDUCATION, and
the DETROIT PUBLIC SCHOOLS,

     Defendants.

Case No. 12-cv-14949
Honorable Laurie J. Michelson
Magistrate Judge R. Steven Whalen

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [43]**

---

John Kelmendi, an Albanian man in his late fifties, was a teacher and administrator at Detroit Public Schools ("DPS") for twenty years. After a promotion he sought was given to a younger Hispanic woman, he filed a charge with the Equal Employment Opportunity Commission for discrimination on the basis of age, national origin, and sex. He began receiving negative performance evaluations, was laid off, and then terminated—in retaliation, he believes, for filing a charge of discrimination. He filed this lawsuit against the Detroit Board of Education and DPS. They now seek summary judgment on all of Kelmendi's claims. As discussed below, the record is rife with conflicting testimony and evidence, requiring that several of Kelmendi's claims proceed to a trial.

## I.  FACTUAL BACKGROUND

The evidence is presented in the light most favorable to Kelmendi, as the party opposing summary judgment. Additional evidence is discussed below in the analysis.

Plaintiff is a native of Albania, born in 1953. (Resp. Ex. 1, Kelmendi Dep. at 7–8.) He began working for the Detroit Public Schools ("DPS") in 1993, as a social studies teacher at

Pershing High School. (*Id.* at 68, 219; Resp. Ex. 12, Kelmendi Resume.) He became a curriculum leader in the social studies department at Pershing in 2003, then curriculum coordinator in 2007, and instructional specialist in 2009. (Kelmendi Dep. at 69–73; Kelmendi Resume.) He continued to teach, but had additional responsibilities that included observing and evaluating other teachers. (*Id.*)

In July 2011, DPS posted a Program Supervisor position in the Department of Multilingual-Multicultural Education. (Mot. Ex. C, Job Posting.) The head of the department, to whom the Program Supervisor reported, was assistant superintendent Frano Ivezaj. (Resp. Ex. 4, Ivezaj Dep. at 19, 27–28.) Ivezaj is also a native of Albania, born in 1958. (Ivezaj Dep. at 6–7.) He chaired the interview committee for the Program Supervisor posting, and selected the other members. (Ivezaj Dep. at 27–28, 37.) The other members were DPS assistant superintendents Alvin Wood, Rebeca Luna, and Jack Elsey.[1] (Ivezaj Dep. at 28.) On August 18, 2011, the committee interviewed six people for the Program Supervisor posting and scored them as follows:

| Name | National Origin, Sex, and Age, if known | Scores | | | | |
|---|---|---|---|---|---|---|
| | | Ivanez | Wood | Luna | Elsey | Average |
| Claudia Martinez | Hispanic female, 37 | 80 | 80 | 83 | 83 | 81.5 |
| Alex Cintron | Puerto Rican male, 43 | 68 | 70 | 84 | 74 | 74 |
| Jose Vera | Male | 75 | 65 | 75 | 77 | 73 |
| Kelmendi | Albanian male, 58 | 73 | 76 | 77 | 65 | 72.75 |
| Sara Millette | Hispanic female, 55 | 75 | 68 | 73 | 64 | 70 |
| Antoaneta Partalis | Female | 65 | 54 | 54 | 58 | 57.75 |

(Ivezaj Dep. 29–30, 38–40; Mot. Ex. G, Interview Schedule; Mot. Ex. H, Interview Scores; Resp. Ex.10, Defs.' Interrogatory Resp. 4.) Although the minimum requirements for the job

---

[1] Global language supervisor Viviana Bonafede also participated in the interview process, but could not score the applicants because her job was at the same level as the position being filled. (Ivezaj Dep. at 28, 41–42; *see* Resp. Ex. 22.)

included at least one year of contractual administrative experience, only two of the candidates—Kelmendi and Cintron—had that experience, according to Ivezaj. (Resp. Ex. 15; Ivezaj Dep. at 50.) Defendants admit that Martinez did not have one year of contractual administrative experience, and that her application materials reflected that. (Resp. Ex. 9 at 5.)

Before the interviews, the committee agreed that only candidates with an average score of 80 or more would be recommended for the position. (Kelmendi Dep. at 52; Mot. Ex. I, Score Recommendation.) Based on the scores, therefore, the only person the committee recommended for the position was Martinez. (Resp. Ex. 22.) The decision to offer the position to Martinez was made by DPS superintendent Karen Ridgeway based on this recommendation of the committee. (Resp. Ex. 5, Ridgeway Dep. at 7, 10, 13.) The position was offered to Martinez on September 8, 2011. (Mot. Ex. K.)

On February 14, 2012, Kelmendi filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that DPS illegally discriminated against him by failing to promote him because of his national origin, sex, and age. (*See* Mot. Ex. L.) According to Kelmendi, he had the EEOC charge forms on his desk and everyone he worked with knew he was thinking about filing a charge. (*See* Kelmendi Dep. at 56–59.) On August 30, 2011, Kelmendi talked to DPS Director of Social Studies Sheryl Jones about filing a discrimination complaint with the EEOC. (*See* Resp. Ex. 23, Jones Statement; Jones Dep. at 22–23.) According to Ivezaj, Jones sent her account of that conversation to Ivezaj and Superintendent Ridgeway. (Ivezaj Dep. at 210–11, 230, 263. *But see* Jones Dep. at 28 (stating she never gave it to Ridgeway); Ridgeway Dep. at 16 (stating she was not aware of Kelmendi's EEOC complaints before this lawsuit).) And Kelmendi testified that after he filed the charge, he "went and [] told" his principal, Donna Thornton, about it; he explained, "You don't hide

3

anything from your principal. You always let the principal know what's going on." (Kelmendi Dep. at 60. *But see* Thornton Dep. at 61–63 (stating she did not know about Kelmendi's EEOC charge).)

In the spring of 2012, Kelmendi's classroom was observed at least four times, by Jones (on May 21), and by Pershing High School assistant principals Tonya Norwood (on March 9), Alicia Brown (on April 23), and Dwayne Robinson (on May 24). (*See* Mot. Exs. P, Q, R, S.) Each observer used a different evaluation format. Norwood wrote a memo that made a number of critical comments such as "[d]ifferentiated instruction was not apparent" and "[m]inimal interaction with students," and concluded that of five possible ratings, Kelmendi rated the middle choice, "satisfactory." (Mot. Ex. P.) Jones checked boxes on a two-page "Formal Observation Form" that resulted in an overall rating of "unsatisfactory" based on a score of 41 out of a possible 112 points. (Mot. Ex. R.) Brown completed a "Teacher Observation Rubric" on Observation 360, the district's computerized teacher evaluation tool. (Mot. Ex. Q; *see* Resp. Ex. 36 at Pg ID 1029.) She did not assign an overall rating or score, but she rated him "minimally effective" on 13 of 15 indicators. (*Id.*) She rated him "effective" on "knowledge of subject," and "ineffective" on "delivery of instruction." (*Id.*) Richardson completed an "End of Year Teacher Evaluation Form" on Observation 360. (*See* Mot. Ex. S.) He also did not assign an overall rating or score. (*See id.*) On four of the five core elements—demonstrated pedagogical skills, student growth as a predominant factor, classroom management, and relevant special training—he rated Kelmendi ineffective. (*See id.*) His ratings for the fifth element, educational responsibilities, were more mixed and included one "highly effective" rating, in "rapport with colleagues, parents, and students." (*See id.*)

The chief human resources and labor relations officer for DPS, Gwendolyn DeJongh, testified that "PD 360" is used by DPS to evaluate teachers. (Resp. Ex. 3, DeJongh Dep. at 36.) For instructional specialists (like Kelmendi), she said a paper evaluation tool is used. (*Id.* at 37–38.) If an instructional specialist teaches in a classroom, DeJongh continued, they "will be evaluated and they can be subject to evaluations but their scores would not be calculated and sent to the state because they're not teachers." (*Id.* at 40.) She said instructional specialists' evaluations are used purely for professional development. (*Id.* at 46.) According to DeJongh, the retention of teachers "is dictated by the ratings the teachers receive," while instructional specialists are laid off or retained based solely on seniority. (*Id.* at 41, 46.) She said instructional specialists would be retained or laid off based on seniority even if they were teaching in a classroom, so long as their primary job code was instructional specialist. (*Id.* at 47.) Superintendent Ridgeway also testified that recall of teachers was based on effectiveness ratings: first the teachers rated highly effective were recalled, then effective, then minimally effective. (Resp. Ex. 5, Ridgeway Dep. at 46; *see also* Resp. Ex. 36 at Pg ID 1018.) She said that teachers rated ineffective would not be recalled unless there was a critical shortage. (*Id.* at 48.)

When Pershing High School was transferred to the state of Michigan's Education Achievement System, DeJongh said, all the teachers were given layoff notices. (DeJongh Dep. at 48.) Other employees, such as instructional specialists, she said "were laid off in accordance with their collective bargaining agreement," so based on their seniority, they "either bumped or moved to or were assigned to the existing DPS schools in a position for which they were qualified and for which they had more seniority." (*Id.* at 48–49.) She said those employees may have received layoff notices but some would later have been rescinded. (*Id.* at 50.)

Kelmendi was notified on April 10, 2012, that he would be laid off effective August 24, 2012. (*See* Resp. Ex. 25; Resp. Ex. 1, Kelmendi Dep. at 37.) He was not recalled for the entire 2012–2013 school year, although other instructional specialists with less seniority were recalled. (*See* Resp. Ex. 32; Resp. Ex. 39.) A spreadsheet of DPS employees on layoff status as of June 1, 2013, indicated that his primary job code was instructional specialist, and that he had a score of 68 percent. (Resp. Ex. 38 at Pg ID 1098.) On the DPS effectiveness scale, 60 to 69 percent is an ineffective rating. (Resp. Ex. 36 at Pg ID 1041.) The only other individual on the spreadsheet of laid-off employees with a job coding of instructional specialist did not have a score indicated. (*See* Resp. Ex. 38.)

On June 7, 2012, Kelmendi filed another charge with the EEOC, alleging that he received poor performance evaluations in retaliation for having filed a charge of discrimination. (*See* Mot. Ex. M.) He filed a third charge on March 12, 2013, alleging that between May and August 2012 he applied for various positions at DPS (for the 2012–13 school year) and was not hired because of his sex, national origin, age, and retaliation for previous charges. (*See* Mot. Ex. N.)

According to Defendants, Kelmendi was recalled for the 2013–2014 school year, in a letter dated May 29, 2013. (*See* Mot. Ex. X; Mot. Ex. W at ¶8.) According to DPS, the letter was mailed to the home address on file for Kelmendi: 8320 Conant in Detroit. (*See id.*) Kelmendi denies receiving the letter, and says he gave DPS a different address, 139 Hayes Road in Shelby Township, before he was laid off. (Kelmendi Dep. at 41–42.) When Kelmendi did not respond to the recall letter, he was deemed to have voluntarily resigned as of June 5, 2013. (*See* Mot. Ex. X at 10.)

Kelmendi filed this lawsuit in November 2012, with several subsequent amended complaints.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is proper only if the moving party shows that the record does not reveal a 'genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted) (citing *First Nat. Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

## III. ANALYSIS

Kelmendi alleges six counts against Defendants: (I) discrimination on the basis of national origin and sex in violation of Title VII; (II) violation of the Age Discrimination in Employment Act ("ADEA"); (III) violation of § 1981 based on national origin discrimination and retaliation; (IV) violation of Michigan's Elliott Larsen Civil Rights Act, based on national origin, sex, and age discrimination and retaliation; (V) tortious interference with contractual or business expectancy; and (VI) violation of Michigan public policy based on retaliation for Kelmendi's exercise of his rights under the Michigan Workers' Compensation Act. (*See* Dkt. 25, Second Am. Compl.) Defendants seek summary judgment on all counts.

In his response brief, Kelmendi "concedes the dismissal of his workers compensation retaliation claim and tortious interference claim," Counts V and VI, respectively. (Resp. at 28 n.2.) At the hearing, Kelmendi also conceded Count III, his § 1981 claims, having failed to respond to Defendants' argument that they should be dismissed as a matter of law. *See*

*McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012) (holding there is no private cause of action under § 1981 against governmental entities or state actors in their official or individual capacities); *Arendale v. City of Memphis*, 519 F.3d 587, 598–99 (6th Cir. 2008) (same). Defendants' motion for summary judgment on Counts III, V, and VI is granted.

Turning to Kelmendi's discrimination claims under Title VII, the ADEA, and ELCRA (Counts I, II, and IV), the Court first addresses, under each statute, whether Kelmendi can establish that he was denied a promotion on the basis of illegal discrimination, and finds that he has presented sufficient evidence to proceed to trial on national origin discrimination, but not on sex or age discrimination. The Court then addresses whether Kelmendi can establish that Defendants retaliated against him for exercising his rights under all three statutes by filing a claim of discrimination with the EEOC, and finds that there is sufficient evidence to submit the retaliation claims to a jury.

## A.  National Origin Discrimination

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The statute further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* at § 200e-2(m). National origin "refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973). Kelmendi alleges that he was denied the Program Supervisor position because he is Albanian.

The analysis under Title VII differs depending on whether the plaintiff's evidence of discrimination is direct or circumstantial. When the evidence is circumstantial, the Court applies the tripartite burden-shifting framework first announced by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 793 (1973), and subsequently modified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 (1981). Alternatively, a plaintiff may set forth a prima facie case of employment discrimination under Title VII by presenting direct evidence of the defendant's discriminatory intent—i.e., "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004). "It shows that the person who made the challenged decision, or was otherwise meaningfully involved in that decision, had a bias or that bias affected the challenged decision." *Hussain v. Highgate Hotels, Inc.*, 126 F. App'x 256, 262 (6th Cir. 2005). If the plaintiff presents direct evidence, he "does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action," as required in the *McDonnell Douglas* framework for circumstantial evidence. Instead, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id.*

Kelmendi argues that the deposition testimony of Ivezaj—the chair of the interview committee and supervisor for the job position—is direct evidence of discrimination. He points to Ivezaj's testimony about why the committee recommended Martinez:

> Q. Looking at these scores, it appears that the committee had reached a consensus that Claudia Martinez was the best candidate for the job, correct?
>
> A. According to the scores, yes.
>
> Q. Why did the committee select or score Claudia Martinez the way they did?
>
> A. You want my opinion?

Q. Based on whatever the—yeah, I want your opinion. You're the chair of this committee. What is your opinion as to why she came out as the successful candidate?

A. First of all, I was surprised that she met the requirements. Second, I believe and it's my opinion because of her age, she was young, vibrant, she was eloquent and also Hispanic.

Q. What does her having to be Hispanic have to do with it?

A. Well, because even Luna mentioned, and although on the posting it says it's not a requirement, "Frano, you know we need to have a Hispanic program supervisor because for too many years we had an Arab, we need a Hispanic," and so again her comments influenced.

Q. So—

A. So of the Hispanic speaking ones, Claudia fared the best.

. . .

Q. Now, let me go back to your—you just made an allegation or a statement that Rebeca Luna said, "We need a Hispanic for this program supervisor position." When did she say that?

A. I believe it was in her office before the interviews began, couple days before. That's when she brought the issue of Alex Cintron and talked about Amal David and about the bilingual department.

Q. Talked about who?

A. Amal David. She was the one that held the position before, and she held it for, I don't know, 20 years, 25 years. And [Luna] said, you know, "It's time that we get a Hispanic. The Arabs had their chance, now it's our turn," and she mentioned Alex.

Q. Was anyone else in this meeting?

A. No, just me and her.

Q. And what was your response to these comments you attribute to her?

A. She was pulling for her own.

(*Id.* at 61–62; *see also id.* at 151–52.) When asked what the committee discussed after Martinez's interview, Ivezaj said it included "that she is Hispanic and has worked in some schools in southwest Detroit." (*Id.* at 68.) And he said his comment to the committee about Martinez was "[t]hat of all the Hispanic candidates, that she was most impressive to me." (*Id.*)

Ivezaj also testified that although he thought Kelmendi was the most qualified and was therefore his first choice candidate, Ivezaj did not lobby for Kelmendi "because of the fact that he was Albanian and I was Albanian American, I didn't want it to seem biased. I wanted the committee to see the qualifications that John had and not to be perceived as though I'm rooting for him because he's Albanian American." (*Id.* at 35–36.) And Ivezaj said he purposely lowballed Kelmendi's score, and told the other committee members he was doing so because Kelmendi was Albanian:

> I made it clear to the members of the interview committee that the next candidate is John Kelmendi. I know him, that he has been active in Detroit Public Schools and worked for bilingual and served in the City Wide Bilingual Multicultural Education Advisory Council under Felix Valbuena, and he has a doctorate, that he did it on Detroit Public Schools bilingual education, But I want you guys to know—and I told them that he's Albanian, and I'm going to take like a back seat on this, even in the rating.

(*Id.* at 53–54.)

Ivezaj also testified about comments made by Superintendent Ridgeway, who made the ultimate decision to hire Martinez based on the committee's ratings and recommendation. In August 2011, after Kelmendi did not get the position, he complained about the selection process to (Director of Social Studies) Sheryl Jones, who informed Ivezaj and Ridgeway about his complaint; Ridgeway then brought it up with Ivezaj and, according to Ivezaj, "she said, you Albanians have big mouths, you're troublemakers." (*Id.* at 230; *see also id.* at 211–12.) Ivezaj also testified that in the fall of 2011, he and Ridgeway "were talking about her twin nephews, David and Daniel, that were attending CMA High School back when I was assistant principal, and she chuckled and she said, 'I don't know about you Albanians.'" (Ivezaj Dep. at 162.)

The Court finds that Kelmendi has sufficiently established a prima facie case based on direct evidence of discrimination. The Court does not make credibility determinations on

motions for summary judgment, and must view the evidence in the non-movant's favor. If Ivezaj's testimony is assumed true, it requires the conclusion that unlawful discrimination was at least a motivating factor in the decision not to give Kelmendi the job he sought. Ivezaj was the chair of the interview committee and supervisor for the job position, and he testified that be believed Martinez was selected because she was Hispanic, based on the committee's discussions during the interview process and the stated intention of another committee member to ensure a Hispanic got the job. He also said that he intentionally gave Kelmendi a lower score because he was Albanian, and that he told the committee that he was doing so. This is direct evidence of unlawful discrimination, if it is found credible. *See DiCarlo*, 358 F.3d at 417 ("the fact that the comments were made by [the plaintiff's] immediate supervisor and a decision-maker, that they specifically negatively and derogatorily referenced DiCarlo's Italian-American heritage, and that the hate-speech occurred three weeks prior to DiCarlo's termination, all culminate in the conclusion that DiCarlo has presented sufficient [direct] evidence of causation to withstand summary judgment"). Defendants argue that Ivezaj's testimony is just unsupported speculation, but Ivezaj has personal knowledge of the committee's deliberation process and his testimony includes specific facts. There is "more than a mere basis for speculation or conjecture." *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004).

Defendants also argue that because Luna was only one member of the four-person committee, Kelmendi has not sufficiently established a causal connection between Luna's stated intention to select a Hispanic person and the committee's decision not to recommend Kelmendi. (*See* Mot. at 20–21; Reply at 7–8.) The Sixth Circuit has held that "although direct evidence generally cannot be based on isolated and ambiguous remarks, when made by an individual with decision-making authority, such remarks become relevant in determining whether there is

enough evidence to establish discrimination." *DiCarlo*, 358 F.3d at 416 (citation omitted); *see also Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) ("Generally, discriminatory comments can qualify as evidence that a particular decision was discriminatory if the speaker was 'in a position to influence the alleged decision.'"). It is not disputed that the ultimate decisionmaker was Ridgeway, but she testified that she accepted the recommendation of the committee, which selected only one candidate: Martinez. (Ridgeway Dep. at 7, 10, 13.) Thus, Luna was clearly an individual with decisionmaking authority. *See Hussain*, 126 F. App'x at 263 (holding plaintiff's supervisor had decisionmaking authority where he "recommended to those with authority that the employee be terminated and awaited their approval"). And so was Ivezaj—who testified that he purposely gave Kelmendi a low score because he was Albanian, and because Luna did not want him to get the job (Ivezaj Dep. at 53–58). Although Ivezaj and Luna were just two of the four members of the committee, Ivezaj testified that Luna made negative comments about Kelmendi to the other committee members during the interview process: "basically, 'John wants our job,' and she laughed like, 'Oh, no, we're not going to have him come to central office." (Ivezaj Dep. at 59.) The jury could reasonably believe that the other two members of the committee—Elsey and Wood—followed Luna's lead, especially since Defendants have not presented any testimony from them.

Finally, Defendants' argument that the scoring of the candidates contradicts Ivezaj's testimony about how the decision was made ignores Plaintiff's position that the scores were just a smokescreen. A reasonable jury could find that the interview process was a pretext for illegal discrimination (although Kelmendi does not actually have to establish pretext, since he proffered direct evidence) based on the evidence presented, including, most significantly, the undisputed fact that Martinez did not meet the minimum job requirements. Defendants protest that Kelmendi

13

also did not meet the job requirements (which Kelmendi disputes, with corroboration from Ivezaj), but they do not explain why so many unqualified candidates were interviewed for the job, in itself a troubling fact. Also suggestive of pretext is the evidence that Luna may have gone "off-script" and asked Kelmendi questions that were not asked of other candidates, contrary to standard DPS procedures. (*See* Ivezaj Dep. at 144–47; Jones Statement at Pg ID 967; *see* DeJongth Dep. at 27–28.) And Ivezaj testified that the DPS interview process was generally "rigged" and he had conversations with Elsey and Wood "[t]hat we were all aware of the fact that the person someone wants is the person who's going to get the job, and the job descriptions are designed to meet exclusively the requirements of the applicant that they wanted to hire." (Ivezaj Dep. at 203–06; *see also* Ivezaj Dep. at 151, 231–32, 275–76). Although in this case the job description was obviously not designed with Martinez in mind, a jury could accept the basic point that "the person someone wants is the person who's going to get the job"—and that here, Luna manipulated the process in order to steer the committee to a Hispanic candidate. Indeed, at least three and probably four of the six candidates interviewed were Hispanic, and neither party has been able to explain how and why those candidates were chosen for interviews.

Defendants do raise many legitimate concerns about the credibility of Kelmendi's claims and Ivezaj's testimony. But the Court cannot say at the summary judgment stage, with its deference to the non-movant's version of the facts, that Defendants have proven by a preponderance of the evidence that they would have made the same decision absent the impermissible motive of national origin discrimination. *Anderson*, 477 U.S. at 249 ("[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."). Kelmendi has met his burden to show there are genuine issues of material fact that national origin was a motivating factor in

Defendants' failure to promote him. Summary judgment is therefore denied on the Title VII national origin discrimination claim in Count I.

### B.  Title VII Sex Discrimination

Kelmendi also alleges that he was discriminated against on the basis of his sex in violation of Title VII. As with national origin discrimination, Kelmendi must show that sex discrimination was a motivating factor in the failure to promote him. *White*, 533 F.3d at 400. But Kelmendi's burden is greater here because he is not a member of the protected class: "A reverse-discrimination claim carries a different and more difficult prima facie burden," that includes "showing that 'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Briggs v. Potter*, 463 F.3d 507, 517 (6th Cir. 2006) (affirming summary judgment on sex discrimination claim where plaintiff had "not produced a shred of evidence that the Postal Service is the unusual employer who discriminates against men") (quoting *Yeager v. Gen. Motors Corp.*, 265 F.3d 389, 397 (6th Cir. 2001)). Kelmendi has not pointed to any evidence that Defendants discriminated against men, beyond the bare fact that the person who was given the Program Supervisor position, despite not meeting the minimum qualifications, was a woman. In fact, the sex discrimination claim is not specifically addressed in Kelmendi's response brief. The Court sees no basis on which a jury could reasonably conclude that sex discrimination was a motivating factor in the decision to deny Kelmendi the Program Supervisor position. *See Carey v. Foley & Lardner LLP*, 577 F. App'x 573, 581 (6th Cir. 2014) (granting summary judgment where plaintiff had "not identified any evidence, apart from his 'own poor treatment,' . . . that [Defendant] discriminated against the majority white and male partners"). Summary judgment is therefore granted on the Title VII sex discrimination claim in Count I.

15

### C. Age Discrimination under the ADEA

Kelmendi's burden to establish unlawful discrimination is greater under the ADEA than under Title VII. Under the ADEA it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on age discrimination "it is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the ADEA's 'because of' language requires that a plaintiff 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the "but-for" cause of the challenged employer decision.'" *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)).

Kelmendi argues that he has proffered direct evidence of discrimination sufficient to submit his ADEA claim to a jury. (Resp. at 30.) "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Scheick*, 766 F.3d at 530 (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)). Thus direct evidence of age discrimination is evidence that "if believed, requires the conclusion that age was the 'but for' cause of the employment decision." *Id.* For direct evidence, Kelmendi points solely to Ivezaj's testimony about why Ivezaj believed his committee recommended Martinez: "I believe and it's my opinion because of her age, she was young, vibrant, she was eloquent and also Hispanic." (Ivezaj Dep. at 61.) Ivezaj also testified that after Martinez's interview there was discussion among the committee members "that she is young." (*Id.* at 67.) But this testimony, even if accepted as credible and accurate, only goes to Martinez's selection, not the failure to select Kelmendi. There were other candidates who could have been selected. Thus, to conclude that

16

Kelmendi would have been selected but for his age requires additional inferences beyond the evidence that Martinez was selected because she was young. Therefore, Kelmendi has not provided direct evidence that but for age discrimination, he would have gotten the job. *See Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009) (finding a discriminatory statement was not direct evidence of age discrimination because additional inferences were required to connect it to an adverse employment action).

Because Kelmendi must rely on circumstantial evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies. Kelmendi must first make out a prima facie case of age discrimination: he must show that (1) he is a member of the protected class (i.e., is over age 40); (2) he applied for and was qualified for the promotion; (3) he was considered for and was denied the promotion; and (4) other employees of similar qualifications who were significantly younger than him received promotions at the time his request was denied. *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812–13 (6th Cir. 2011); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003). Once the plaintiff meets this prima facie burden, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for failing to promote the plaintiff to the position sought. *Provenzano*, 663 F.3d at 814. If this burden is met, "the presumption of discrimination is gone and the plaintiff must demonstrate that the employer's proffered nondiscriminatory reason was not the true reason for the employment decision, but rather a pretext for discrimination." *Id.* at 815 (citing *Burdine*, 450 U.S. at 256). "A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct,

17

or (3) was insufficient to warrant the challenged conduct.'" *Id.* (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

Defendants do not appear to dispute that Kelmendi can establish a prima facie case: he applied for and was qualified for the Program Supervisor position, and it was denied him and given to a significantly younger person. At the hearing, counsel for Defendants said the legitimate nondiscriminatory reason Kelmendi was not selected was that Martinez interviewed the best. Turning then to pretext, the Court has already found, in assessing the Title VII national origin claim, that there is sufficient evidence on which a reasonable jury could find that the interview process was a pretext for illegal discrimination.

But, as mentioned, the burden to show discrimination under the ADEA is greater than the burden under Title VII. The Supreme Court and the Sixth Circuit have emphasized that throughout the *McDonnell Douglas* burden-shifting analysis for an ADEA claim, the burden of persuasion remains on the plaintiff at all times to demonstrate that age was a "but-for" cause of the employer's adverse action. *Geiger*, 579 F.3d at 620 (quoting *Gross*, 557 U.S. at 177). As discussed above, and as conceded by Plaintiff's counsel at oral argument, the focus of Ivezaj's testimony is that the committee was intent on selecting a Hispanic candidate. Although her age may have given her the nod among the other Hispanic candidates, there is nothing in the record that suggests that, if Martinez had not been Hispanic, she would have been selected because of her age. The sole evidence of age discrimination is Ivezaj's testimony that, in addition to referencing Martinez's vibrance and national origin, the committee also commented favorably on her youth. But Ivezaj's testimony (if believed) makes clear that had Martinez been Arabic, for example, she would not have been selected, regardless of her age. Even Plaintiff's counsel acknowledged, at the hearing, that this is "predominantly a national origin claim." A reasonable

jury could not conclude based on Ivezaj's testimony that but for Martinez's age or Kelmendi's age, a different promotion decision would have been made. While the Court recognizes that there can be more than one but-for cause, *see Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012), this record does not create a genuine issue of material fact that *but for age discrimination*, Kelmendi would have gotten the job. Thus, the Court finds that Kelmendi has not met his burden to demonstrate that age was a "but-for" cause of the failure to promote him. Summary judgment is granted on the age discrimination claim in Count II.

### D. ELCRA

Michigan's ELCRA prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age . . . ." Mich. Comp. Laws § 37.2202(1)(a). "[U]nder the ELCRA a plaintiff must ultimately prove that the defendant's discriminatory animus was a 'substantial' or 'motivating' factor in the decision." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011) (citing *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 192–93 (Mich. 2003)). Because Kelmendi's burden of persuasion for his ELCRA claims is the same as that required for Title VII the same outcome results: a reasonable jury could infer that discrimination on the basis of national origin, but not sex, was a substantial or motivating factor in the failure to promote Kelmendi.

As for age discrimination, Kelmendi's burden under ELCRA is lower than that required for the ADEA. Under the ELCRA's lesser "motivating factor" test, the Court finds that Kelmendi's evidence of age discrimination, although scant, is sufficient to create a genuine issue of material fact that age was a motivating factor in the failure to promote him. The Court simply cannot say that no reasonable jury could find that Martinez's youth, or Kelmendi's relative lack

19

thereof, did not at least slightly tip the scales in favor of Martinez and against Kelmendi. *See Patterson v. Roscommon Cnty. Rd. Comm'n*, No. 253662, 2005 WL 1522144, at *1 (Mich. Ct. App. June 28, 2005) (reversing summary disposition for employer where the plaintiff's union representative testified that he asked defendant's chief financial officer why plaintiff and another applicant were not offered the position, and he was told that "their age was one thing"); *Allen v. DaimlerChrysler Corp.*, No. 265427, 2006 WL 626239, at *2 (Mich. Ct. App. Mar. 14, 2006) (finding that a supervisor's comments about having too many old people and needing young employees was circumstantial evidence that a trier of fact could interpret as proof of bias).

Summary judgment on Count IV is therefore denied as to national origin and age discrimination and granted as to sex discrimination.

### E. Retaliation

Title VII, the ADEA, and ELCRA prohibit an employer from retaliating against an employee because he has filed a charge of discrimination. *See* 42 U.S.C. § 2000e–3(a); 29 U.S.C. § 623(d); Mich. Comp. Laws Ann. § 37.2701(a). To establish a prima facie case of retaliation under any of these statutes, Kelmendi must demonstrate that (1) he engaged in protected activity; (2) Defendants knew of his protected activity; (3) thereafter, Defendants took adverse action against him; and (4) a causal connection existed between the protected activity and the materially adverse action. *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015) (Title VII); *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012) (ADEA); *Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 653 (Mich. 2005) (ELCRA). If Kelmendi can establish a prima facie case, the burden of production shifts to Defendants to proffer some legitimate, nonretaliatory reasons for its actions. *Id.* If Defendants do so, the burden of persuasion shifts back to Kelmendi to show that the proffered reasons were not the true

20

reasons for the employment decision, i.e., that the reasons were a pretext for retaliation. *Id.* But ultimately, at least for the federal retaliation claims, Kelmendi must establish but-for causation: "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *New Breed Logistics*, 783 F.3d at 1066 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, — U.S. —, 133 S. Ct. 2517, 2533 (2013)).

Defendants first argue that Kelmendi's negative performance evaluations did not constitute materially adverse employment actions, as required for a prima facie case of retaliation, because they did not significantly affect his salary or professional advancement. (Mot at 28.) Kelmendi does not expressly respond to this argument, focusing instead on his layoff and failure to be recalled as adverse actions. (*See* Resp. at 38.) Defendants return that the retaliation claim must be dismissed because all instructional specialists were laid off following the 2011–2012 school year, and because Defendants based recall of instructional specialists—including Kelmendi—on seniority and subject area certification. (Reply at 9–11.) Defendants say that "of the 10 former instructional specialists recalled in August 2012, with less seniority than Plaintiff, only 4 were recalled as instructional specialists and none of those 4 instructional specialists were recalled for positions in Plaintiff's subject area/certification." (*Id.*at 10–11.)

First, Defendants do not adequately support the latter statement. One of the four less senior instructional specialists who was recalled before Kelmendi, Natalie Briggs, is certified in math and social studies for sixth through eighth grades (thus overlapping with Kelmendi's certification in social studies and bilingual for sixth through twelfth grades), and there is no evidence that she was recalled as a math specialist and not a social studies specialist. (*See* Resp.

Ex. 39 at Pg ID 1113; Mich. Dep't of Educ., Educator Certification Status, https://mdoe.state.mi.us/MOECS/PublicCredentialSearch.aspx.)[2]

Second, this argument raises the question why Kelmendi was not recalled as a teacher, as other instructional specialists were. Indeed, it appears that Kelmendi's counsel asked Defendants this very question and did not receive any response. (*See* Resp. Ex. 40 at Pg ID 1126–27.) At the hearing, counsel for Defendants said he thought Kelmendi would have to apply, interview, and be hired to obtain a teacher position. Kelmendi says he did apply for positions at DPS in the spring and fall of 2012, and was not hired. (*See* Kelmendi Dep. at 262–72.) Defendants acknowledge that when a teacher applies for a position, the administrator doing the hiring can get access to the teacher's final evaluation scores. (*See* Mot. at 9 ¶ 36; Thornton Dep. at 33–34.) A reasonable jury could conclude that Kelmendi's negative performance evaluations prevented him from obtaining the teaching jobs he applied for, and therefore were materially adverse employment actions, contrary to Defendants' argument. *See Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 433 (6th Cir. 2007) ("If the Supreme Court views excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement as materially adverse conduct, *see Burlington*, 126 S.Ct. at 2415–16, then markedly lower performance-evaluation scores that significantly impact an employee's wages or professional advancement are also materially adverse."). The Court therefore finds that there are disputed issues of fact regarding the failure to recall Kelmendi for the 2012–2013 school year that are material to the retaliation claims.

---

[2] Defendants did not provide subject area certification information for the recalled instructional specialists, instead indicating generally that the information was available on its web site. (*See* Reply at 11 n.7.)

Defendants next argue that Kelmendi cannot show that his negative performance evaluations and layoff were causally connected to his EEOC charges. (Mot. at 29.) But close temporal proximity can be circumstantial evidence of causation. *See Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014). Here, the chronology is sufficiently close: the first negative evaluation took place on March 9, 2012, less than a month after Kelmendi's first EEOC charge, on February 12, 2012, and the layoff letter was dated April 10, 2012, less than two months after the first charge. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (finding plaintiff's termination three months after he filed a discrimination charge was sufficiently close in time to satisfy plaintiff's prima facie burden to establish causal connection).

Kelmendi has also offered evidence of retaliatory intent by DPS administrators. Ivezaj testified that after Kelmendi complained to Sheryl Jones and Jones sent her written account of the conversation (including the statement that Kelmendi said he had filed an EEOC charge) to Superintendent Ridgeway, Ridgeway "was very upset and angry at John," and said, "We need to handle this John Kelmendi," and "Did you read what Sheryl wrote." (Ivezaj Dep. at 78.) And Kelmendi testified at his deposition about conversations he had with his principal:

> Q. What did Donna Thornton say in response, if anything, about the EEOC charge or your intent to file one?
>
> A. Then she said before I filed, she said, "I would think very deeply and closely before you file," and I said, "I know they going to come at me like bolting, light of bolting, I know." She said, "It may happen worse than that," and I said, "Well, I haven't made up my mind yet." And when I did [file the charge], I told her and she said, "I'm sorry, I can't help you from here on. I think you made the mistake of your life." I said, "Well, I'm going to let a jury decide that."
>
> . . .
>
> Q. Was that the only conversation or were there subsequent conversations?
>
> A. After that time we had conversations over there.
>
> Q. You and Donna Thornton?

23

A. Yes.

Q. Tell me about those conversations. What was discussed?

A. She said, "You opened the Pandora's box, Kelmendi."

. . .

Q. Any other conversations you had with Donna Thornton regarding your charges or claims or lawsuit?

A. Yes. I asked her to please stop if she could all the retaliation that I was receiving from her staff members, from her subordinates.

Q. And what was her response?

A. She said, "I'm not aware of any of that stuff," so then I started putting stuff in writing.

(Kelmendi Dep. at 61–63.) Ridgeway and Thornton denied any knowledge of Kelmendi's EEOC charge before this lawsuit, but it is for a jury to decide whether to believe them or Ivezaj and Kelmendi. Kelmendi has offered sufficient evidence of causal connection to convince a reasonable jury, and thus has met his burden to establish a prima facie case of retaliation.

Defendants proffer as their legitimate, nonretaliatory explanation that all instructional specialists were laid off after the 2011–2012 school year, and Kelmendi was recalled two years later when a vacant instructional specialist position in his subject area was available. (Reply at 11–12.) Kelmendi has raised enough disputed fact issues with this explanation that a reasonable jury could find it is pretextual. As noted, it has not been clearly established that the instructional specialist vacancies in Kelmendi's subject area were not filled by someone with less seniority than Kelmendi (i.e., Briggs). And then there are Kelmendi's negative performance reviews, which may have played a role in his failure to obtain a job as a teacher: there is evidence of irregularities in the evaluation process that Defendants have not completely explained, such as the evaluators' use of four different formats, including the "PD 360" system that DPS Chief HR officer DeJongh said was for evaluating teachers (not instructional specialists), that Kelmendi's ineffective rating was calculated and recorded although DeJongh testified that instructional

24

specialists' evaluations were used purely for professional development, and that Brown's evaluation may have been conducted after report cards were issued and during homeroom time rather than an instructional period (*see* Resp. Ex. 41 at Pg ID 1134).

Furthermore, the evidence regarding Kelmendi's termination is very unclear: Defendants say they terminated Kelmendi because he failed to respond to the recall notice, and that he never properly updated his address, while Kelmendi says he did provide an updated address but never received the recall notice. (*See* Kelmendi Dep. at 22–54; Resp. Ex. 42; Mot. Exs. D, E, F, U, V, X.) It appears that Kelmendi was homeless and moving around for a time, so it is understandable that the letter would not have reached him, but it also appears that Defendants may have continued to use an outdated address for Kelmendi even after he submitted updates. If so, a jury could infer that Defendants did not truly intend to recall Kelmendi.

In short, there are material, disputed issues of fact that preclude summary judgment on Kelmendi's retaliation claims. Summary judgment is denied on Counts I, II, and IV with respect to retaliation.

## IV. CONCLUSION

Summary judgment is granted on Counts II (ADEA), III (§ 1981), V (tortious interference), and VI (public policy), granted in part on Count I (Title VII) with respect to sex discrimination, and granted in part on Count IV (ELCRA) with respect to sex discrimination. Summary judgment is denied in part on Count I (Title VII) with respect to national origin and retaliation discrimination, and denied in part on Count IV (ELCRA), with respect to national origin, age, and retaliation discrimination. The Court will set a status conference to schedule the

trial and related deadlines.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  July 16, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 16, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson