UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN P. KELMENDI,

     Plaintiff,

v.

DETROIT BOARD OF EDUCATION and
DETROIT PUBLIC SCHOOLS,

     Defendants.

Case No. 12-14949
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' RENEWED MOTION IN LIMINE [92] DENYING DEFENDANTS' ORAL MOTION FOR JUDGMENT AS A MATTER OF LAW, DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE, FOR A NEW TRIAL [108], AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR ATTORNEY FEES [111]**

---

This employment discrimination and retaliation case under Title VII, the Age Discrimination in Employment Act, and Michigan's Elliott-Larsen Civil Rights Act, went to trial in September 2016. The jury found no liability on Plaintiff John Kelmendi's claim that Defendants Detroit Public Schools and Detroit Board of Education discriminated against him when they denied him a promotion opportunity. But the jury found that Defendants retaliated against him for filing several EEOC complaints and awarded him back pay, front pay, and non-economic damages totaling $630,900. The Court took two motions under advisement before submitting the case to the jury, and two other motions have followed since the verdict.

For the reasons that will be discussed, the Court will grant in part Defendants' motion *in limine* to bar back pay and front pay (which the Court had taken under advisement) and will vacate the jury's front pay award of $152,400. The Court will deny Defendants' Rule 50(a) motion for judgment as a matter of law (which the Court had also taken under advisement), deny

Defendants' post-trial Rule 50(b) motion, and also deny Defendants' alternative Rule 59 motion for a new trial. Finally, the Court will grant in part Plaintiff's motion for attorney fees and prejudgment interest.

## I.

### A.

Plaintiff John Kelmendi served as a teacher and administrator throughout his lengthy career with the Detroit Public Schools system. Sometime around 2008 or 2009, Kelmendi became an "instructional specialist," a role he had at Detroit's Pershing High School at certain times relevant to this case. (R. 103, PID 2219.)

On July 8, 2011, DPS's Department of Multilingual-Multicultural Education posted an opening for a position called "Program Supervisor, Bilingual." (Ex. 1.[1]) Kelmendi applied. (Ex. 3, 4.) A committee of assistant superintendents interviewed him and several other candidates that August. (Ex. 5.) They did not select Kelmendi. Instead, the committee chose Claudia Martinez, a younger, Hispanic woman. (Ex. 74, 75.)

The core of Kelmendi's case has been his claim that DPS refused to hire him for the program supervisor position because of his age and national origin (Albanian). For instance, the leader of the hiring committee, former assistant superintendent Frano Ivezaj (himself Albanian), testified that DPS wanted someone Hispanic to fill the role. Kelmendi and Ivezaj also both claimed that one of the committee members inappropriately asked Kelmendi additional questions that were not asked of other candidates. But Kelmendi's and Ivezaj's accounts were inconsistent, and other committee members denied that claim.

---

[1] Citations to exhibits refer to the exhibits as they were admitted at trial.

The jury rejected Kelmendi's discrimination claim. But it found that DPS retaliated against him after he complained about the hiring process and other issues. So what follows is a description of the trial testimony pertinent to Kelmendi's retaliation claim.

**B.**

In late August 2011, Kelmendi complained to Sheryl Jones, then-Director of Social Studies at Pershing High School, about the program supervisor position's hiring process. Jones testified that, among other things, Kelmendi said he was "going to file an EEOC case against the District." (R. 102, PID 2095.) She had written the same in a statement she drafted shortly after the encounter. (Ex. 36.) For his part, Kelmendi actually denied that he said anything about the EEOC during his conversation with Jones. (R. 103, PID 2240.) But Kelmendi did testify that he told someone named Minnie Pierce he would be filing an EEOC charge. (R. 103, PID 2234–36.) He did not say when he had the conversation or who she was. He also testified that he went to an unspecified place, asked how to fill out the forms for EEOC charges, and filled them out in November 2011. (R. 103, PID 2236.) But he said that he held off filing his charge because he was waiting for someone to "come and say, . . . 'Dr. K, I'm sorry. We have a position for you. We are going to compensate you.'" (R. 103, PID 2236.)

That never happened. So on February 14, 2012, Kelmendi filed a charge of discrimination with the EEOC. He claimed that DPS denied him the program supervisor position because of his age, sex, and national origin. (Ex. 45.)

At trial, Kelmendi claimed that two main forms of retaliation flowed from this charge: a series of poor evaluations, and because of the negative evaluations, difficulty getting rehired following a school-wide reduction in force.

**1.**

Shortly after filing his EEOC complaint, Kelmendi indeed received a series of poor teaching evaluations. At the time, DPS had reclassified many instructional specialists like Kelmendi as teachers to take on class loads to fill a shortage. (R. 103, PID 2170–72.) It was unclear whether Kelmendi had been formally reclassified as a teacher, but he spent at least some time teaching in early 2012. As then-principal, Donna Thornton, testified, he taught two classes at Pershing High School under her. (R. 104, PID 2278.)

The first problematic evaluation came on March 9, 2012, when Tonya Norwood, an assistant principal at Kelmendi's school, observed that Kelmendi's performance was "satisfactory" but also noted some deficiencies. (Ex. 7.) For example: "Lesson plans should be more detailed"; "Accommodations must be made for special education students"; "Attendance was not taken in first ten minutes of class"; "Minimal interaction with students"; and one student "came to class late . . . and was eating food." Kelmendi disputed this evaluation's validity, saying that Norwood "does not even hold a certification" and that "only the principal could have come and evaluated" him. (R. 103, PID 2244.)

The second evaluation came on April 23, 2012. Alicia Brown, another assistant principal, used an evaluation form called a "PS 360," indicating that Kelmendi was "effective" in one area, "ineffective" in one, and "minimally effective" in a multitude of other areas. (Ex. 8.)

Kelmendi pointed to several problems with this evaluation. First, Kelmendi testified that Brown stayed for only 23 minutes of his one-hour and twenty-five-minute class. (R. 105, PID 2430–31.) He said it was required for evaluators to stay for the whole class. (R. 105, PID 2498–99.) Second, Kelmendi also claimed that Brown never followed up with him within 24 hours of the evaluation, as required. But he admitted that he called in sick for the next three school days

afterward and was therefore not even available to meet with her. (R. 105, PID 2428, 2503.) Third, Kelmendi disputed the propriety of using a 360 evaluation on an instructional specialist. To that end, Ivezaj testified that the 360 tool was designed to evaluate teachers, not instructional specialists. (R. 101, PID 1925–26.) But Gwendolyn de Jongh, the former head of DPS's human resources, said that if an instructional specialist was also teaching—as Kelmendi was—it would be appropriate to use that evaluation tool because all teachers had to be evaluated. (R. 103, PID 2167–68.) But she added that if the instructional specialist had not been "reclassified" as a teacher, it would have been inappropriate to use the 360 tool. (R. 103, PID 2174.) Thornton testified that Kelmendi was not formally reclassified, but like any instructional specialist who teaches, he was nevertheless subject to evaluation as a teacher. (R. 104, PID 2279, 2299.)

This second evaluation led to a third one. On May 16, 2012, Thornton emailed administrators at DPS, including Ivezaj, and asked to have six teachers, including Kelmendi, evaluated. (Ex. 35.) She testified that these six individuals wanted to refute previous poor evaluations. (R. 104, PID 2281.) She said that she had not at that time known that Kelmendi was planning to, or had already filed, his EEOC charge. (R. 104, PID 2288.) But Kelmendi testified that both Thornton and the prior evaluators had seen his EEOC complaint sitting on his desk. (R. 103, PID 2239.)

In response to Thornton's request, the third evaluation happened on May 21, 2012. Sheryl Jones—the one to whom Kelmendi had initially complained about the hiring process—was the evaluator. But Jones testified that by this time, she did not know Kelmendi had "actually filed" an EEOC charge. (R. 102, PID 2111.) Jones filled out a "Formal Observation Form" instead of another 360, scoring Kelmendi 41 points, which fell in the category of "unsatisfactory"—the

lowest possible. (Ex. 9.) She noted, among other things, "Instruction was never delivered, record books were unavailable, students came in and out of classroom at will."

Kelmendi disputed the validity of this evaluation as well. For instance, Ivezaj testified that Jones was not qualified to evaluate Kelmendi because the two had been in conflict with one another, and her background was not in the appropriate area. (R. 101, PID 1937–38.) Jones countered that both she and Kelmendi were social studies specialists, that she was qualified to evaluate Kelmendi, and that she thought the two had a "great relationship." (R. 102, PID 2098–99.) Ivezaj also testified that prior to Thornton's email requesting the evaluation, he had not heard of a principal ever directly approaching the central office to request an observation of an instructional specialist. (R. 101, PID 1927.) Kelmendi also urged that he was set up to fail. For instance, he testified that Jones "came late and left within 21 minutes." (R. 103, PID 2248.) He also said that in the particular class she evaluated, "I had autistic children. I had dea[f] children. I had mentally impaired children. I had ADD's in there, 14 of them. . . . I had five levels of bilingual education in there, beginners who weren't going to graduate." (R. 103, PID 2247–48.)[2]

Kelmendi testified that after each evaluation, he wrote a memo to each evaluator and gave a copy to the union leader and principal. (R. 105, PID 2434.) He claimed that before these evaluations (and thus before his EEOC charge) he had received only one form of negative feedback: he worked too hard. (R. 105, PID 2448.)

On June 7, 2012, Kelmendi filed another charge of discrimination with the EEOC. (Ex. 46.) He claimed that the poor performance evaluations on March 9, 2012, April 23, 2012, and May 21, 2012 were a retaliatory response to his prior discrimination charge.

---

[2] Another 360 evaluation was filled out on May 24, 2012 by Dwayne Richardson, who indicated that Kelmendi was "ineffective" in many areas, "minimally effective" in several, effective in several, and "highly effective" in another. (Ex. 10.) There was little testimony on this particular evaluation.

Defendants nonetheless offered evidence suggesting that there were plenty of legitimate reasons to scrutinize Kelmendi's classroom performance. For instance, Kelmendi's principal, Thornton, testified that a student had previously complained that she "wasn't getting her academic rigor like she should" in his class. (R. 104, PID 2287.) Thornton had also discovered an irregularity in one student's record. The student had "F's" in every class, save a sole "A" in Kelmendi's—even though she had been absent for months and had actually attended an entirely different school outside of the DPS system during the time that Kelmendi awarded her the "A." (R. 104, PID 2289–90.) Thornton said that when she confronted Kelmendi, he "was adamant" that the student had taken the final exam—even though Kelmendi had marked her absent the day of the exam. (R. 104, PID 2291.)

**2.**

Kelmendi's second theory of retaliation flowed from the first: Kelmendi claimed that because of the poor evaluations and his EEOC charges, once DPS laid him off in a system-wide reduction-in-force, he could not get rehired within DPS or hired elsewhere.

A layoff notice dated April 10, 2012, stated that due to the financial emergency facing Detroit Public Schools, and an ensuing workforce reduction, Kelmendi would be laid off effective the end of the day August 24, 2012. (Ex. 11.) Another letter dated August 22, 2012 would later confirm that. (Ex. 12.)

Kelmendi testified that between May 23, 2012 and August 23, 2012, he went to various job fairs to find another position but was told by unspecified people from unspecified schools that he would have to drop his EEOC charge to be hired. (R. 105, PID 2406.) He also testified that his poor performance review—particularly the 360 evaluation—was in a "public database" and that at least two principals of schools to which he applied (one in another district) cited his

poor rating for declining to hire him. (R. 105, PID 2445, 2448, 2473.) According to Kelmendi, employees with the highest performance evaluation ratings had priority when DPS recalled people from layoff status. (R. 105, PID 2446.)

The parties disputed whether anyone outside of Kelmendi's DPS superiors had access to his 360 evaluation. Kelmendi claimed that he actually saw his 360 evaluation in a public database (although only by accessing it in a mysterious back room somewhere): "I went to Wayne County Intermediate Schools. I have some friends there who were administrators. I said, 'Would you show me how to get into this website?' They took me to a back room, was a . . . computer. They showed me how to enter on it, how to look it. I looked at it." (R. 105, PID 2442.) Ivezaj said that he "was told" that 360s were public. (R. 102, PID 2016.) But the then-superintendent, Karen Ridgeway, testified that "there are never any individual teachers' scores that are actually publicized" or available to other school districts through the system and that DPS published aggregated teacher evaluation data alone. (R. 81, PID 2068–69.)

On March 10, 2013, Kelmendi filed another charge of discrimination with the EEOC. (Ex. 47.) He claimed that between May 23, 2012 and August 23, 2012 he had applied for various DPS positions but had been denied employment due to, among other things, retaliation for his prior complaints.

Despite his poor performance ratings, a May 29, 2013 letter notified Kelmendi that DPS had recalled him to employment. (Ex. 13.) The letter stated that he had five days to respond. Otherwise, DPS would consider his employment voluntarily resigned. Kelmendi claimed that this recall itself was retaliatory because DPS intentionally sent it to the wrong address so that he would not be able to respond in time. This too was disputed.

DPS sent the letter to a Detroit address that was undisputedly associated with Kelmendi. He admitted that he at times lived at the address, both in the late 1990s and in 2014 during a period in which he claims he was homeless. (R. 105, PID 2487.) The address was an abandoned house that his father owned. (R. 105, PID 2488.) He not only lived at that address at times but also used it as his address of record for at least some DPS-related issues. For instance, when Kelmendi applied for the program supervisor position in 2011, his application, resume, and cover letter all used the Detroit address. Kelmendi's explanation for why he too used this supposedly wrong address was that his wife prepared his application and inadvertently used the Detroit address. (R. 105, PID 2477–78.)

According to Kelmendi, DPS should have sent the recall notice to a Shelby Township address. Kelmendi produced a DPS "change of address" form dated August 18, 2006, which lists his Shelby Township address as his new address. (Ex. 69.) Kelmendi testified that he filled out the form at DPS's human resources, and they gave him a copy. (R. 105, PID 2482.) But de Jongh (the former human resources head) testified that she could not determine when or if human resources received the form because the form had no date-stamp. (R. 103, PID 2161.) Still, Kelmendi produced a letter showing that at least someone at DPS had his Shelby Township address—a November 2006 letter regarding leave under the Family Medical Leave Act. (Ex. 68.) But de Jongh suggested that it was possible that only the "Leave Management" department of human resources had the Shelby Twshp. address and that this address did not actually get into the system. (R. 103, PID 2164.)

In any event, Kelmendi never returned to DPS following the May 2013 recall letter.

## C.

The trial raised another issue impacting Kelmendi's claim that he could not return to work due to DPS's retaliation: would his health even have permitted him to return?

This issue stems from a work-related injury that Kelmendi suffered just before DPS laid him off. Kelmendi testified that on June 7, 2012, two boxes of books fell on him while he was working in his school's book room, hitting his back and head and injuring his left shoulder. (R. 105, PID 2410–11.) It also reinjured his knee that he had injured at work in 2006. (R. 105, PID 2420, 2422.)

As a result of the June 2012 injury, the parties vigorously contested whether Kelmendi could return to work, and if so, in what capacity—as a teacher or as an instructional specialist.

This calls for a brief discussion of the distinction between the two positions. According to Ivezaj: "A teacher is one who has at least five classes to teach per day. Five hours in a class of 15 or more students and that is a teacher. An instructional specialist may work with a teacher with a few students. Instructional specialist may provide the resources the teacher need. Instructional specialist goes in and observes the teacher as a colleague and supports that teacher so that she could do her job more effectively and efficiently. An instructional specialist may model. They may recommend to the principal a particular workshop that the teacher can benefit from. So, it's just to support the teacher." (R. 101, PID 1924.) He added that instructional specialists are not teachers. (R. 101, PID 1924.) But he later testified that they are part of the teachers union, paid as teachers, and that principals can utilize them as teachers. (R. 102, PID 2019–20.) Jones similarly testified that instructional specialists are "master teachers who can support teachers in instruction. They can provide model lessons. They can show the teacher actually, hands on, this is how you teach this c[l]as[s]" and that their duties "could include covering classes." (R. 102,

PID 2093.) And again, many instructional specialists had been reclassified as teachers to take a larger class load.

To support his claim for back pay and front pay, Kelmendi's theory at trial was that he was healthy enough to work as an instructional specialist but would need surgery (and recovery time) to be able to return to the classroom as a teacher. (*See*, *e.g.*, R. 105, PID 2474.) The defense painted this theory as inconsistent with Kelmendi's conduct between the time of his injury until the time of trial.

First, Kelmendi filed a worker's compensation claim in which he and his longtime treating physician, Dr. Peter Salvia, at times apparently took the position that Kelmendi was totally unable to work. Kelmendi admitted that at the worker's compensation trial, he appeared with a cane and a "shoulder pouch," and he wore a knee brace every day. (R. 105, PID 2536.) Even though trial in this case happened just a few months later, Kelmendi appeared with no such props. He also admitted that he testified at the worker's compensation trial that his condition was extreme—for instance, he had to crawl to the bathroom. (R. 105, PID 2541.) Defendants also impeached him with testimony from that trial in which he answered "no" to the question of whether he could "do anything." (R. 105, PID 2543.) Salvia also admitted that twice in connection with Kelmendi's worker's compensation claim, he testified that Kelmendi was "unable to work." (R. 106, PID 2578.)

Second, Kelmendi applied for social security supplemental security income benefits, and an administrative law judge found him to be "disabled" within the meaning of the Social Security Act because of his condition.

As background, by February 2013, Kelmendi said he was "totally out of every single dime" and "sold everything" to pay for his medication. (R. 105, PID 2424.) He said that his wife

filed for divorce at around this time too. He said that when she "left, she took everything." (R. 105, PID 2460.) Kelmendi said that when he was trying to figure out how to have Medicaid cover the surgery he needed, he was told by an unspecified person at an unspecified place at an unspecified time (a common theme in his testimony) that "[i]t's a rule" that he also "must apply for Social Security and SSI" even though he did not want to. (R. 105, PID 2464.) So he applied for Social Security benefits in January 2014. (R. 105, PID 2464.) He said that when he applied for social security, he indicated that he was an instructional specialist, that that was an "administrative position," and that he could not work as a teacher absent the surgery. (R. 105, PID 2533.) The ALJ found that Kelmendi's residual functional capacity precluded him from teaching. (*See* Ex. 37.) The ALJ made no mention of the instructional specialist position or any administrative positions in Kelmendi's prior work history or future work prospects.

Third, in October 2014, DPS ultimately offered to reinstate Kelmendi as a *teacher*—not as an instructional specialist. (R. 105, PID 2512.) Kelmendi offered many suspect reasons for rejecting that offer in his testimony. His health was not one of them.

He said that his union had advised him that he would lose his tenure and pension if he took the new position and would have no "medical coverage whatsoever." (R. 105, PID 2521–22.) He could not identify which union people gave him this information—only that he had spoken with two people (a Caucasian man and an African-American man), both of whom told him to reject the offer and insist on becoming an instructional specialist without any "conditions" to being rehired. (R. 105, PID 2529; R. 106, PID 2583–85.) He also said the union told him that DPS made the reinstatement offer in "bad faith." (R. 105, PID 2530.) Kelmendi also claimed that an unnamed person with the state of Michigan advised him not to take the position. (R. 106, PID 2651.)

Dr. Salvia's testimony also clouded whether Kelmendi could return to work as an instructional specialist. Kelmendi said that Dr. Salvia had told him he could do "administrative work," including his "old responsibilities as an instructional specialist." (R. 105, PID 2466–67.) Salvia himself testified that Kelmendi has been unable to work as a teacher since June 2012 but could do other work. (R. 106, PID 2575.) Salvia similarly testified that Kelmendi could work as an administrator without restrictions but not at all as a teacher. (R. 106, PID 2561.) But he also said, "I am not quite sure what the functions of an Instructional Specialist are so I'd be unqualified to discuss that." (R. 106, PID 2571.) Yet he admitted that in his prior deposition that he had testified that Kelmendi could not perform the duties of an instructional specialist. (*Id.*) Dr. Salvia said he had recommended knee and neck surgery, but Kelmendi could not pay for them. (R. 106, PID 2557.) Dr. Salvia said that it would take six weeks for Kelmendi to recover from the knee surgery and nine weeks from the neck surgery. (R. 106, PID 2560–61.)

## D.

Kelmendi presented limited evidence surrounding damages. His claim for non-economic damages centered on the psychological issues and bout with homelessness he says he suffered following the layoff. For example, a former Pershing High School security officer who was friends with Kelmendi testified that Kelmendi called him on August 31, 2014 and told him he was homeless. (R. 103, PID 2124, 2127–28.) The officer said that he found Kelmendi sleeping under an overpass. (R. 103, PID 2128.)

Dr. Salvia also testified that when Kelmendi was homeless and divorced, he was depressed, so he referred him to a psychiatrist. (R. 106, PID 2564–65.) Kelmendi said that he had sought mental health care after he was not promoted but no one would pay for his treatment—though he had an appointment "next Friday." (R. 106, PID 2629.) Kelmendi testified that he was

depressed and felt anxiety "especially before the school opens up or there's a holiday or something, because I enjoyed what I did. That was my life." (R. 106, PID 2646.) Kelmendi said that when he was homeless, "I was very depressed. It was a point in my life that whether I lived or died, it really didn't matter." (R. 105, PID 2485.)

As for economic damages, the figures came solely from Kelmendi's own testimony. Kelmendi testified that he never planned to retire and would work at least until age 75, an additional 12 years, or roughly 16 from when he was terminated. (R. 106, PID 2634.) Kelmendi testified that had he worked until 75, his pension would have been "probably over 5,000" per month instead of the current level of $1,960 he was vested at. (R. 16, PID 2635.) Kelmendi also testified that his net salary as an instructional specialist was "probably" $1,800 every two weeks. (R. 106, PID 2637.) As for the social security benefits he received, Kelmendi testified that he received $960 some months, $1060 other months, and once $1,140. (R. 106, PID 2637.) He said the gross was $1,300 per month. (R. 106, PID 2650.) It is not clear exactly when he started to receive the benefits. The ALJ approved the award in August 2015, but Kelmendi testified, "I don't know how they figured out what time, how. I just know I received benefits after 2013." (R. 105, PID 2533.)

**E.**

By way of procedural background, Defendants filed a series of pretrial motions *in limine*, including a motion "To Bar Any Claim For Back Pay And/Or Front Pay Damages." (R. 78.) Defendants offered several theories in that motion, including that the Court should bar Kelmendi from receiving any back pay or front pay "for any period after he was approved for and began receiving Social Security disability benefits." (R. 78, PID 1410.) Defendants cited no authority for that position and put forth no evidence concerning Kelmendi's Social Security benefits. So

14

the Court denied the motion, noting that Kelmendi had acknowledged that "his social security disability benefits should be deducted from any back pay awards." (R. 91, PID 1709.)

Several days before the trial, Defendants filed a renewed motion *in limine* to bar any back pay or front pay as a matter of law. (R. 92.) Defendants again urged—this time with at least some authority and evidence (though still limited)—that the Court should bar Kelmendi's back pay and front pay because of his receipt of social security disability benefits. The Court took the motion under advisement pending the outcome of the jury's verdict. The Court also took under advisement Defendants' motion for judgment as a matter of law, which they made at the close of Kelmendi's case.

As noted, the jury directed a verdict for Defendants on Kelmendi's discrimination claim but found that Defendants had unlawfully retaliated against him. The jury awarded Kelmendi $228,500 in back pay, $152,400 in front pay, and $250,000 in non-economic damages. (R. 97.)

Post-trial, Defendants filed a motion for judgment as a matter of law, or in the alternative, for a new trial. (R. 108.) Kelmendi also filed a motion for attorneys' fees and prejudgment interest. (R. 111.)

All of the pending motions are fully briefed and ready for disposition. After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motions. *See* E.D. Mich. LR 7.1(f)(2).

## II.

The Court begins with Defendants' renewed motion *in limine* to bar back and front pay due to Kelmendi's receipt of social security disability benefits.

The Court must first address a threshold issue: should the Court have sent the issue of front pay to the jury?

Front pay, or future damages, "is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001) (Title VII). "Back pay, in contrast, is money awarded for lost compensation during the period between the date of the plaintiff's injury . . . and the date on which damages are determined." *Szeinbach v. Ohio State Univ.*, 820 F.3d 814, 820 (6th Cir. 2016) (Title VII (citation omitted)).

While front pay and back pay have a similar nature, they trigger a different division of labor for judge and jury. Under Title VII, ADEA, or ELCRA, the propriety of a back pay award hinges on a finding of liability (and should generally follow such a finding). *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (U.S. 1975) (holding under Title VII that "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination"); *see also Howe v. City of Akron*, 801 F.3d 718, 744 (6th Cir. 2015) (citing *Albermarle* in the Title VII and ADEA context); *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 32 (Mich. 1994) (holding under ELCRA "that the trial court erred as a matter of law by deciding the continued backpay issue *before* the factfinder decided defendants' ultimate liability for the alleged discriminatory discharge" (emphasis in original)). The Sixth Circuit has even gone as far as to say that back pay is "a *presumptive entitlement* of a plaintiff who successfully prosecutes an

employment discrimination case." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1171, *opinion amended on denial of reh'g*, 97 F.3d 833 (6th Cir. 1996) (Title VII (emphasis added)).

Front pay is different. Trial courts play a gatekeeping role and can thus dispense with any possibility of a front pay award before a jury reaches a finding on liability. As the Sixth Circuit has held, "While the determination of the precise amount of an award of front pay is a jury question, the initial determination of the propriety of an award of front pay is a matter for the court." *Arban v. W. Pub. Corp.*, 345 F.3d 390, 406 (6th Cir. 2003) (internal quotation marks and citation omitted). *Arban* addressed front pay under FMLA, but the Court borrowed its rule from an ADEA case, *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir.1993). Afterward, at least one other Sixth Circuit panel has applied the rule in the Title VII context as well. *See West v. Tyson Foods, Inc.*, 374 F. App'x 624, 641 (6th Cir. 2010). This division of labor between judge and jury also appears to be the rule under Michigan law for claims under ELCRA. *See Riethmiller v. Blue Cross & Blue Shield of Michigan*, 390 N.W.2d 227, 233 (Mich. Ct. App. 1986) (per curiam) (holding under ELCRA that "the trial court should have discretion in deciding, based on circumstances of each case, whether to award future damages"); *see also Nemeth v. Clark Equip. Co.*, No. K84-433 CAB, 1988 WL 156345, at *2 (W.D. Mich. Sept. 9, 1988) (holding that based on *Riethmiller* and the Michigan model jury instruction for future damages under ELCRA, "It appears clear that under Michigan law, the Court determines whether future damages are available to a given plaintiff, . . . while the jury determines the amount of those damages"); *but see Landin v. Healthsource Saginaw, Inc.*, 854 N.W.2d 152, 166 (Mich. Ct. App. 2014) (questioning whether *Riethmiller* gives trial courts a gatekeeping role for front pay).

In sum, this Court must determine whether a front pay award is appropriate. The Court acknowledges that "determination of whether an award of front pay is appropriate, and its articulation of the reasons why such an award is or is not appropriate, must ordinarily precede its submission of the case to the jury." *Roush*, 10 F.3d at 398–99. The Court deviated from that ordinary course here and took the matter under advisement for at least two reasons. First, while the Court welcomed additional briefing on the issue after Defendants' bare-bones renewed motion *in limine*, the Court did not receive any before it was time to instruct the jury (and still has received little from Defendants). Additionally, the parties agreed to a host of jury instructions relevant to front pay, including the nature of front pay—"lost future wages and lost future benefits, that you decide plaintiff is reasonably certain to sustain in the future" (R. 96, PID 1824), the need to consider the effects of inflation for such damages (R. 96, PID 1826), the need to reduce such damages to their present value (R. 96, PID 1827), how to reduce such damages to their present value (R. 96, PID 1828), and the need to reduce those damages based on any finding that Kelmendi failed to mitigate (R. 96, PID 1830). *See Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995) (holding that district court's error of allowing the jury to determine the "propriety of a front pay award" was harmless because district court "court specifically instructed the jury on what factors to consider in setting the amount of the award," as opposed to *Roush*, where the district court gave the jury "virtually no guidance" on the issue).

## 2.

For the reasons that follow, the Court now finds that Kelmendi is not entitled to a front pay award.

To start, reinstatement, not front pay, "is the presumptively favored equitable remedy." *Roush*, 10 F.3d at 398 (citation omitted). "[W]hile reinstatement should be granted in the

ordinary case, . . . it is an equitable remedy which is not appropriate in every case, such as . . . where hostility would result." *Id.* (citations omitted). With that in mind, when the Court took this matter under advisement before submitting the case to the jury, the Court noted that reinstatement did not appear to be the appropriate remedy because of the possible hostility that would result had Kelmendi replaced the program supervisor whom DPS had hired instead of him. (R. 104, PID 2336.) The Court did not address the appropriateness of reinstating Kelmendi to his former position as an instructional specialist, which became the only relevant issue after the jury found against Kelmendi on his discrimination claim surrounding the program supervisor hiring decision (that is, the jury found that the decision not to promote Kelmendi was not discriminatory). At trial, Kelmendi adamantly maintained that he was ready and able to return to work as an instructional specialist. Yet strikingly, he has never once insisted on reinstatement to that position at one of DPS's many schools in lieu of front pay. Nor has he explained why reinstatement to that position would be inappropriate. Accordingly, because the Court is unconvinced that reinstatement—the presumptively favored remedy—is not appropriate, it is difficult to say that front pay—the fallback remedy—*is*.

Still, Kelmendi's failure to request reinstatement does not necessarily preclude his claim to front pay. *See Roush*, 10 F.3d at 398 n.8 ("We have never held that a plaintiff must request reinstatement as a prerequisite to recovering front pay[.]"). Instead, "awards of front pay must be guided by consideration of certain factors, including an employee's duty to mitigate, 'the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other factors that are pertinent on prospective damage

awards.'" *Id.* at 399 (*quoting Shore v. Federal Express Corp.*, 777 F.2d 1155, 1160 (6th Cir. 1985).[3] These factors counsel against granting Kelmendi's claim to front pay.

First, Kelmendi's mitigation efforts trouble the Court. Again, DPS offered to reinstate him as a teacher in October 2014. Kelmendi's reason for rejecting that offer is unsupported — that unnamed and unknown union representatives and someone from the state of Michigan advised him to reject it because it would impact his tenure and pension. Strangely, he did not cite his health, even though his claim throughout trial was that he could not return to DPS as a *teacher*, only as an administrator. Still, pretrial, the Court denied DPS's motion *in limine* on this issue, reserving the issue of mitigation for the jury. (R. 91.) The jury's verdict form provided a specific question on the issue of mitigation, and the jury found that Defendants failed to prove that Kelmendi did not mitigate. (R. 97.) Defendants' motions under Rule 50 and Rule 59 have not asked the Court to disturb that finding. So while the Court considers this factor, it is not dispositive.

Second, as for the availability of employment opportunities, Kelmendi testified that he sought other positions internally at DPS and outside of DPS but had trouble getting hired because of the poor evaluations and his standing EEOC charge. The Court is skeptical of his

---

[3] The *Roush* Court arguably suggested that these factors were for the jury to consider in calculating the amount of a front pay award, not for the Court to consider during its gatekeeping role. Indeed, the Court observed that the "most obvious reason why" a district court should determine whether a front pay award is appropriate prior to the submission of the case to the jury is that "the jury must be instructed on what factors to consider in determining the amount of front pay." 10 F.3d at 398. It would make sense for these factors to be for the jury's consideration: evidence supporting these factors would seldom be available to the Court pre-trial, when this issue would likely be first-litigated, as it was here. Nonetheless, Sixth Circuit cases following *Roush* have commonly said that these factors are for the Court's consideration, saying that the factors "must be considered when determining the propriety of an award of front pay." *See, e.g.*, *Arban*, 345 F.3d at 406 (quoting *Roush*, 10 F.3d at 399 (emphasis added)); *McKelvey v. Sec'y of U.S. Army*, 450 F. App'x 532, 537 (6th Cir. 2011); *Lewis v. Quaker Chem. Corp.*, 229 F.3d 1152, *10 (6th Cir. 2000) (table).

theory that he could not get hired outside of DPS because his 360 evaluation was in a public database: he says he came to find that out by accessing his 360 in a mysterious back room via random people at another school district. (R. 105, PID 2442.) But no one testified that they failed to hire or even consider Kelmendi because of his evaluations. In any event, even assuming his evaluations rendered him unemployable for other positions, Kelmendi offered no evidence on the potential salary he would have commanded had he been able to obtain any of the positions he sought.

Third, regarding "the period within which [Kelmendi] by reasonable efforts may be re-employed" and his "work and life expectancy," the Court has concerns. Kelmendi had "to provide at least some evidence . . . to establish a reasonable limit on the duration on the award." *Burton v. Zwicker & Assocs., PSC*, 577 F. App'x 555, 567 (6th Cir. 2014) ("[E]vidence must be submitted from which a reasonable projection can be made. Such an estimation must involve more than mere guesswork." (citation omitted)). Arguably, Kelmendi's relatively advanced age makes this different from cases in which the plaintiff is young, where front pay is generally inappropriate because an award would require "highly speculative projections" about the employee's "earning capacity and about employment decisions decades into the future." *See McKelvey v. Sec'y of U.S. Army*, 450 F. App'x 532, 537 (6th Cir. 2011) (citation omitted). But Kelmendi resisted putting any reasonable time limit on his front pay award. He insisted that he never planned to retire and that "I don't even plan today to retire." (R. 106, PID 2634.) He added that his dad "worked til he was 85" and that "I'm going to work until I'm 75 at least." (*Id.*) Even taking age 75 as the time limit, Kelmendi's health status makes it highly speculative to say that he could work that far into the future. He has not worked since 2012. Nothing in the record appears to suggest he has recently sought work as an instructional specialist or in another

administrative capacity. And while he maintains that he could return to work as a teacher with the appropriate surgery, nothing in the record suggests that he will obtain that surgery, and if he did, what the likelihood of success would be. Thus, the time limit Kelmendi provided is unreasonable.

As for the final factor, Kelmendi provided no evidence such as "discount tables to determine the present value of future damages." Kelmendi "need not have paraded a team of economists in front of the [Court] to meet his burden of proof," *Burton*, 577 F. App'x at 567, and the Court acknowledges that the jury was instructed on how to discount a future damages award to present value (*see* R. 96, PID 1827–28). But most troubling is that, at the very least, "[a] plaintiff who seeks an award of front pay must provide the district court with the essential data necessary to calculate a reasonably certain front pay award." *Arban*, 345 F.3d at 407 (citations omitted). Kelmendi has not done that. True, he discussed his bi-weekly salary as an instructional specialist. But "[s]imply proving one's salary is not enough." *Burton*, 577 F. App'x at 567. And Kelmendi arguably fell short of even doing that. He threw out only a rounded estimate of his past salary, "probably 1,800 every two weeks . . . It's about 1,800." (R. 106, PID 2636), and offered no data on what his future salary would have been had he stayed at DPS or worked elsewhere.

On balance, these factors—and Kelmendi's lack of evidence offered to support his front pay award—weigh against finding that a front pay award would be appropriate here. Accordingly, the Court will grant Defendants' motion *in limine* to the extent it seeks to eliminate Kelmendi's front pay (i.e., the Court should not have sent that issue to the jury). The Court will thus vacate that aspect of the jury's verdict.

**B.**

The Court turns to back pay.

**1.**

This discussion has another threshold issue: should the Court have determined the propriety of a back pay award pretrial? In their pre-trial motion *in limine*, Defendants suggested that the answer was yes, citing *Arban* and asking the Court to bar back pay entirely before the jury reached the issue of liability. But again, the propriety of a back pay award generally depends on a finding of liability—something that obviously has to wait until trial. Nonetheless, two issues give the Court pause on the issue of whether a back pay award was appropriate here.

One is whether the jury should have had a role in calculating back pay once they found liability. Under Title VII, back pay is a form of equitable relief that the Court has discretion to award under 42 U.S.C. § 2000e-5(g)(1). *See Szeinbach*, 820 F.3d at 820. As such, some authority suggests that judges, not juries, should generally calculate back pay. *See, e.g.*, *Harris v. Richards Mfg. Co.*, 675 F.2d 811, 815 n.2 (6th Cir. 1982) ("Back pay is recoverable under either Title VII or Section 1981. Under the law of this circuit, back pay is equitable relief and the parties are, therefore, not entitled to a jury trial on that issue." (citation omitted)); *see also Howe,* 801 F.3d at 744–746 (providing the *district court* with a methodology to calculate back pay on remand); *but see Szeinbach*, 820 F.3d at 827 (affirming remittitur of jury-calculated back pay award in Title VII case but not taking issue with fact that jury calculated it).

Yet, "[w]hen legal and equitable issues to be decided in the same case depend on common determinations of fact, such questions of fact are submitted to the jury, and the court in resolving the equitable issues is then bound by the jury's findings on them." *Arban*, 345 F.3d at 408 (citation omitted). And there is good reason to think under the two other statutes that gave rise to Kelmendi's successful retaliation claim—ADEA and ELCRA—back pay is a *legal* not equitable remedy and therefore properly fell within the jury's purview.

While the *Howe* Court suggested in passing that, like with back pay under Title VII, ADEA back pay is a form of equitable relief, *see* 801 F.3d at 744, at least one Court of Appeals that has examined the issue in-depth has concluded that "a back pay award given under the ADEA is a legal remedy," not an equitable one, *see Sailor v. Hubbell*, Inc., 4 F.3d 323, 325–26 (4th Cir. 1993) (citing cases).

And a similar argument can be made that back pay is a legal remedy under ELCRA's damages provision, Mich. Comp. Laws Ann. § 37.2801. For instance, in *Schafke v. Chrysler Corp.,* 383 N.W.2d 141, 143 (Mich. Ct. App. 1985) (per curiam), the Michigan Court of Appeals noted that "damages" under M.C.L. § 37.2801 include "damages which 'flow' from the discrimination," including "loss of wages." The Michigan model jury instruction for "Mitigation of Damages for Loss of Compensation" also inherently suggests that calculation of back pay is a jury issue, providing that the jury must reduce damages for "what the plaintiff earned" and "what the plaintiff could have earned with reasonable effort" during the period the jury determines the plaintiff is entitled to damages. *See* Mich. M Civ JI 105.41. In short, just because back pay is an equitable remedy under Title VII does not mean the issue should have been withheld from the jury's consideration.

The second issue that gives the Court some pause is that, like with front pay, Kelmendi provided a dearth of evidence to support his back pay award. "An award of back pay . . . should ordinarily consist of lost salary, including anticipated raises, and fringe benefits." *Howe*, 801 F.3d at 746 (citation omitted). But Kelmendi offered no evidence of his anticipated raises during the back pay period or the value of his fringe benefits. Further, "[t]o prevail on a claim for back pay under Title VII, a plaintiff must establish the amount of back pay with reasonable certainty." *Szeinbach*, 820 F.3d at 824 (citation omitted); *see also Roush*, 10 F.3d at 397 n.7 (The jury's

award of back pay [under ADEA] was required to be reasonable and within the range of proofs in the case."). Kelmendi's health status during the period he was eligible for back pay at the very least clouds that certainty. Not only that, but as with front pay, the evidence he offered amounted to nothing more than a rounded estimate of his net salary as an instructional specialist, $1,800 every two weeks. Assuming that the jury generously found he was entitled to back pay from late August 2012 (when his layoff became effective) until the late September 2016 (when the trial ended), that adds up to a total of 49 months of back pay, which would equal $191,000. And this number is even less after social-security is deducted (as the jury was instructed to do). Yet the jury awarded $228,500.[4]

But Defendants do not attack the back pay award as excessive or unsupported (except in a passing remark in their response to Kelmendi's motion for attorneys' fees, which will be discussed later). Instead, Defendants seek only to eliminate the back pay award entirely—and for an unpersuasive reason. Thus, the Court will not disturb the back pay award.

### 2.

Defendants' sole theory in their renewed motion *in limine* (and in their post-trial motion for judgment as a matter of law) is that Kelmendi's receipt of social security benefits—standing alone—should preclude his back pay award because his social security claim of disability is inconsistent with his back pay claim that he can still work. On that point, the Court disagrees.

Defendants rely on a line of distinguishable cases under the Americans with Disabilities Act. Specifically, in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 797 (1999), the Supreme Court addressed the interplay between social security disability claims and ADA

---

[4] The jury was also instructed to add interest at a rate of 2.32% per year from the time the damages began until November 6, 2012, the date he initiated this case. (*See* R. 96, PID 1829.) Given this several-month window of interest accumulation, interest could not have accounted for the extra $40,000 in back pay.

discrimination claims, asking "whether the law erects a special presumption that would significantly inhibit an SSDI recipient from simultaneously pursuing an action for disability discrimination under the [ADA], claiming that 'with . . . reasonable accommodation' she could 'perform the essential functions' of her job." The Court answered no, holding that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim" or even "erect a strong presumption against the recipient's success under the ADA." *Id.* at 797–98. But the Court also held that "an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work." *Id.* at 798. As the Court explained:

> An ADA plaintiff bears the burden of proving that she is a "qualified individual with a disability"—that is, a person "who, with or without reasonable accommodation, can perform the essential functions" of her job. 42 U.S.C. § 12111(8). And a plaintiff's sworn assertion in an application for disability benefits that she is, for example, "unable to work" will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation. For that reason, we hold that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation.

*Id*. at 806.

A Sixth Circuit panel's decision in *Stallings v. Detroit Pub. Sch.*, 658 F. App'x 221 (6th Cir. 2016), illustrates the issue in the teaching context. Stallings, like Kelmendi, worked for DPS. Though she was a teacher, she requested a "sit down" job with "no classroom" exposure to accommodate a knee injury. *Id.* at 223. After DPS refused to continue accommodating her, she retired and shortly thereafter applied for social security disability benefits. *Id.* at 223–24. She later sued DPS, claiming that DPS failed to accommodate her in violation of the ADA. *Id.* at 224. The Sixth Circuit affirmed summary judgment in DPS's favor under *Cleveland*, reasoning, "It is incongruous for plaintiff to claim on September 10 [the date she retired] that she could perform her essential job functions with [certain accommodation], only to claim on the 18th [the

date of her social security disability application] that she would remain incapacitated even with the benefit of that accommodation." *Id.* at 226.

As hinted at above in the Court's summary of the evidence, the Court finds troubling the inconsistencies in Kelmendi's claims about his health. The evidence lends itself to the view that when it suits Kelmendi, such as in his worker's compensation claim, both he and his treating physician claim he cannot work at all. But here, where his claim for economic damages to some extent requires his ability to work, he takes a different tack. Still, several factors caution against using this ADA line of cases to eliminate the jury's back pay award completely.

First, the cases discussed above appear to focus on representations made in *applications* for social security benefits, not the ALJ's ultimate findings. And here, Kelmendi's application for social security benefits is not in the record. (However, the Court scoured the district court docket in *Stallings* and found no evidence that the application was in the record there either. The Sixth Circuit appears to have inferred Stallings' representations in her application from the ALJ's opinion.) So all the Court has is Kelmendi's own testimony. And he said that when he applied for social security benefits, he indicated that he was an instructional specialist, that that was an "administrative position," and that he could not work as a teacher absent the surgery. (R. 105, PID 2533.) In other words, according to Kelmendi, he did not tell the Social Security Administration he was precluded from all work or, specifically, the job of instructional specialist.

Second, "[n]either application for nor receipt of social security benefits is by itself conclusive evidence that an individual is completely incapable of working." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 429 (6th Cir. 2014). As the *Cleveland* Court observed, "an individual might qualify for SSDI under the SSA's administrative rules and yet, due to special individual circumstances, remain capable of performing the essential functions of

her job." *Cleveland*, 526 U.S. at 805 (internal quotation marks omitted). Here, the nature of the ALJ's determination of Kelmendi's disability status was not necessarily inconsistent with the idea that he could return to work as an instructional specialist. (*See* Ex. 37.) Nothing about that position appears in the decision. The ALJ defined Kelmendi's "past relevant work" as "secondary education teacher." The ALJ found that given Kelmendi's residual functional capacity, he could no longer work as a teacher. The ALJ made no findings specific to whether Kelmendi was disabled from serving as an instructional specialist or any other administrative role. While the differences between being an instructional specialist and a teacher appear minimal, the evidence is consistent with the conclusion that instructional specialists spend less time in the classroom compared to teachers and have more administrative duties. In other words, an instructional specialist has more of a sedentary role.

Perhaps the ALJ did not address the distinction between the two roles because Kelmendi's application did not, as he claimed, mention he was an instructional specialist. But maybe instead the distinction between teaching and being an instructional specialist was simply lost on the ALJ. As the answer is not clear, the Court does not see this as a basis to eliminate the back pay award. *See Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540, 549 (6th Cir. 1989) (noting that ambiguities surrounding back pay should be resolved against the employer).

Nor does the Court find convincing that the ALJ implicitly found that Kelmendi was disabled from serving as an instructional specialist simply because the ALJ found that Kelmendi was disabled generally and that "there are no jobs that exist in significant numbers in the national economic that [he] can perform." Medical necessity did not drive this finding. Instead, expedience under Social Security regulations did. As one court has explained, the Commission's "Medical-Vocational Guidelines," which are contained in Appendix 2 to Subpart P of 20 C.F.R.

§ 404, "require that a person of advanced age with a high school education be found disabled unless [he] has acquired transferable skills as a result of [his] past relevant work which can be applied to other work with 'very little, if any' vocational adjustment." *Watkins v. Comm'r of Soc. Sec.*, No. 1:14-CV-514, 2015 WL 1476743, at *7 (S.D. Ohio Mar. 31, 2015), *report and recommendation adopted sub nom.*, 2015 WL 5158938 (S.D. Ohio Sept. 3, 2015) (citing 20 C.F.R., Part 404, Subpt. P, App. 2, §§ 201.00(f), 201.06). Kelmendi's ALJ found that he was of advanced age, had at least a high school education, and did not have sufficiently transferable skills. Thus, the ALJ held, "Even if [Kelmendi] were capable of engaging in the full range of sedentary work, considering his age, education and work experience, Medical-Vocational Rule 201.06 directs a finding of disability."

In sum, the ALJ's finding of disability is not necessarily inconsistent with Kelmendi's ability to serve as an instructional specialist (i.e., sedentary work). And without Kelmendi's application for benefits in the record, the Court cannot say for sure that Kelmendi based his disability claim on the notion that he was totally unable to work, as Defendants urge.

A final distinction is this: while the ability to perform the "essential functions" of one's job, with or without accommodation, may be an element of an ADA claim, it is not necessarily an element or requirement to obtain back pay under Title VII, ADEA, or ELCRA.

It is true that, as Defendants point out, some courts have observed in passing or outright held that a plaintiff is not entitled to back pay from a period of time in which he was disabled. *See Lathem v. Dep't of Children & Youth Servs.,* 172 F.3d 786, 794 (11th Cir.1999) ("[C]ourts exclude periods where a plaintiff is unavailable to work, such as periods of disability, from the back pay award."); *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1101 (3rd Cir. 1995) ("[A]s a general rule . . . an employer who has discriminated need not reimburse the plaintiffs for

salary loss attributable to the plaintiffs and unrelated to the employment discrimination." (internal quotation marks omitted)); *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) ("Saulpaugh is only entitled to losses suffered 'as a result' of defendants' discrimination. . . . Because Saulpaugh would not have been entitled to her salary from the Hospital while disabled, her losses after 1988 were not the result of the discrimination that she suffered.").

But the wisdom of such a rule is not uniform. Back pay is more than simply one's lost salary because it also includes fringe benefits. Thus, as the First Circuit has noted, it makes little sense to cut off a back pay award entirely during a period of disability: "If the plaintiff would have been entitled to some form of salary continuation or benefits for disability had he remained employed at the discriminatory employer, it is not clear why he would not be entitled to the equivalent if he became disabled from working post-employment and before trial . . . This reasoning is simply a logical outgrowth of the principle that back pay should put the plaintiff in the position he or she would have been in but for the unlawful discrimination." *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 383 n.17 (1st Cir. 2004) (Title VII).

The Court is not aware of any binding authority on this issue under the relevant statutory regimes at play here, Title VII, ADEA, and ELCRA. But some courts have treated disability-related benefits such as worker's compensation as "collateral sources" and refused to deduct them from back pay. *See Thurman*, 90 F.3d at 1171 (holding under Title VII and Section 1981 that "the trial court's deduction of unemployment and worker's compensation from backpay is reversed" because of the "presumptive entitlement to back pay"). Other courts have done what Kelmendi agreed to here by way of the jury instructions: deducted social security disability benefits from back pay awards. *See Flowers v. Komatsu Min. Sys., Inc.*, 165 F.3d 554, 558 (7th

Cir. 1999) (recognizing in ADA case that "[i]t is within the district court's discretion to set off—or not to set off—social security disability payments" during the back pay period); *see also Cantrell v. Knoxville Cmty. Dev. Corp.*, 60 F.3d 1177, 1182 n.2 (6th Cir. 1995) (noting for an unspecified type of disability benefit in a Title VII case, "The district court properly offset temporary total disability benefits received by Cantrell against the back-pay award.").

The Court endorsed the deduction approach when it instructed the jury and still believes that is the best approach given the possible consistency between Kelmendi's social security disability claim and his entitlement to back pay. In short, given the jury's liability finding and Defendants' failure to attack the sufficiency of evidence supporting the back pay award, the Court is hard pressed to say that none of the award was justified. Thus, to the extent Defendants' renewed motion *in limine* seeks to cut the entire back pay award, the Court will deny the motion.

## III.

The Court next turns to Defendants' oral motion for judgment as a matter of law made at the close of Kelmendi's case-in-chief.

Federal Rule of Civil Procedure 50(a) allows a party to bring a motion for judgment as a matter of law "at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). Judgment as a matter of law may be warranted "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).

Defendants' oral motion advanced one argument specific to Kelmendi's successful retaliation claim: "There is no evidence whatsoever that the plaintiff's national origin or age had anything whatsoever to do with his lay-off or him not being recalled as timely as he believes he should have been called. There is no evidence that anyone involved with this decision to lay him

off or rather to recall him, . . . Donna Thornton or anyone, any administrator in a position who was making decisions here had any type of animus toward Dr. Kelmendi because of his national origin or race." (R. 106, PID 2655.)

This argument does not account for the difference between a retaliation claim and a discrimination claim. As the Supreme Court has explained in the Title VII context, "The substantive [anti-discrimination] provision [of Title VII] seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

In other words, when it comes to the retaliation claim, it does not matter that Kelmendi failed to present any evidence that the retaliators had animus toward him on the basis of his national origin or age. What matters is whether they had animus toward him because of his protected activity, which took the form of three EEOC charges against DPS. And as the Sixth Circuit has explained in the Title VII and ADEA retaliation context, post-trial, the sufficiency of the evidence inquiry turns to "the ultimate question: whether [Kelmendi] produced sufficient evidence to support the jury's finding that [Defendants took an adverse action] in retaliation for his *complaints of* age and national-origin discrimination." *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 545–46 (6th Cir. 2008) (emphasis added). Defendants' age or national origin-based discriminatory animus is not part of that inquiry.

Accordingly, the Court will deny Defendants' motion for judgment as a matter of law under Rule 50(a).

## IV.

Post-trial, Defendants filed a renewed motion for judgment as a matter of law. In the alternative, they moved for a new trial. (R. 108.)

## A.

The Court begins with the relevant standards. The Court may grant a Rule 50(b) motion for judgment as a matter of law only "when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Rhinehimer v. U.S. Bancorp Investments, Inc.*, 787 F.3d 797, 804 (6th Cir. 2015) (quoting *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005)). "The evidence should not be weighed, and the credibility of the witnesses should not be questioned. The judgment of [the] court should not be substituted for that of the jury." *Id.* (quoting *Balsley v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012)).

Rule 59(a)(1)(A) provides that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." "The language of Rule 59(a) has been interpreted to mean that a new trial is warranted when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015) (internal quotation marks and citations omitted). "When a party requests a new trial on the ground that the verdict is against the weight of the evidence, [the Court] will uphold the jury verdict if it is one the jury reasonably could have reached; [the Court] cannot set it aside

simply because [it] think[s] another result is more justified." *Id.* (internal quotation marks and citation omitted).

**B.**

As a threshold issue, Kelmendi argues that Defendants have waived all of the arguments raised in the Rule 50(b) motion. The Court disagrees.

Kelmendi first claims that Defendants' failure to renew their Rule 50(a) motion at the close of all the evidence precludes their Rule 50(b) motion. He relies on *Gutzwiller v. Fenik*, 860 F.2d 1317, 1330 (6th Cir. 1988), where the Court applied a prior version of Rule 50(b) and noted that the rule "has long been construed to preclude a district court from entertaining a motion for JNOV unless the movant has first sought a directed verdict after presentation of all the evidence." But Rule 50(b) was amended in 2006 "to permit renewal of any Rule 50(a) motion for judgment as a matter of law, deleting the requirement that a motion be made at the close of all the evidence." *See* Fed. R. Civ. P. 50 Advisory Committee Note to 2006 Amendment.

Kelmendi also argues that Defendants' Rule 50(b) motion improperly advances grounds they did not raise in their earlier Rule 50(a) motion. "Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." *Hometown Folks, LLC v. S & B Wilson, Inc.*, 643 F.3d 520, 527 (6th Cir. 2011) (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 50 Advisory Committee Note to 2006 Amendment.

This is a closer call. But the three grounds advanced in Defendants' motion all stem from the same issue raised in Defendants' pretrial renewed motion *in limine*—Kelmendi's failure to explain the contradiction between his application for social security benefits and his present claims about his ability to work. First, Defendants argue that this inconsistency negates an

essential element of Kelmendi's retaliation claim. Second and third, Defendants argue that because Kelmendi's retaliation claim fails due to that inconsistency, he is not entitled to economic damages or non-economic damages. Thus, Kelmendi had plenty of notice of the issue and has had plenty of opportunity to respond with evidence and briefing. *See Morningstar v. Worthy*, 454 F. App'x 391, 398 (6th Cir. 2011) ("[W]here Rule 50(a)'s purpose—i.e., providing notice to the court and opposing counsel of any deficiencies in the opposing party's case prior to sending it to the jury—has been met, courts usually take a liberal view of what constitutes a pre-verdict motion sufficient to support a post-verdict motion." (quoting *Kusens v. Pascal Co.*, 448 F.3d 349, 361 (6th Cir. 2006)). So while Defendants initially presented the disability issue pretrial in the form of a motion *in limine*, not a Rule 50(a) motion, the Court finds that it is still proper to consider the issue on a renewed motion for judgment as a matter of law, as the original motion struck at the sufficiency of the evidence. *See Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 318 n.12 (6th Cir. 2011) (treating motion *in limine* as Rule 50(a) motion because, among other things, the "motion was based on an argument of insufficient evidence").

So the Court will address the merits of Defendants' arguments.

## C.

### 1.

Defendants' first argument is as follows: an essential element of Kelmendi's retaliation claim is that he was subject to an adverse employment action, under *Stallings* and *Cleveland* (the ADA cases described above), Kelmendi "failed to provide a sufficient explanation for the clear contradiction between his application for social security disability benefits and his claim in this action that he is capable of working," and "[t]his failure negates an essential element of his

retaliation claim—that he was subject to an adverse employment action by being laid off and not recalled." (R. 108, PID 2735–2737.)

As discussed, the Court is unpersuaded that the ADA cases relied on by Defendants require Kelmendi to explain any inconsistency in this context or that he failed as a matter of law failed to do so. And Defendants offer no authority to support their contention that an unexplained inconsistency between Kelmendi's social security disability benefits and his claims for back pay and front pay would negate the adverse employment action element of the retaliation claim.

As for the Rule 59(a) component of this ground, Defendants say they are entitled to a new trial because "(1) there has been a complete failure of proof as to an essential element of Plaintiff's retaliation claim embraced in the jury's verdict, (2) the undisputed contradiction between Plaintiff's application for Social Security disability benefits and his claim in this case compels a different verdict as a matter of law, and (3) the evidence is legally insufficient to sustain the verdict in Plaintiff's favor." (R. 108, PID 2738.) That is the extent of the argument.

This argument is unpersuasive for the same reasons discussed above.

## 2.

Defendants' second argument is a variant of their first. Defendants' first premise is as follows: "To recover under Title VII, the ADEA or ELCRA, Plaintiff must prove that he suffered injury *as a result of* the alleged retaliation." (R. 108, PID 2738 (emphasis in original).) Defendants' second premise is this: "Plaintiff has been continuously disabled and unable to work since June 2012." (R. 108, PID 2739.) Thus, say Defendants, "his alleged economic (back pay and front pay) damages, as well as his alleged non-economic damages, cannot be deemed to be *as a result of* Defendants' alleged retaliation." (R. 108, PID 2739–40 (emphasis in original).)

The second premise and conclusion are again flawed. As the Court has discussed, neither Kelmendi's social security disability claim, nor the evidence presented at trial, establish that he was completely unable to work since June 2012. Even if he was, the jury was instructed to offset from the back pay award any social security disability benefits received during periods of disability, which appears to be a viable alternative to negating liability.

As for Defendants' alternative motion for a new trial on this ground, they offer the same skeletal argument they did for their first argument: they are entitled to a new trial because "(1) there has been a complete failure of proof that Plaintiff has suffered any damages *as a result of* Defendants' alleged retaliation, (2) the failure of proof compels a different verdict as a matter of law, and (3) the evidence, or lack thereof, is legally insufficient to sustain the verdict in Plaintiff's favor." (R. 108, PID 2740.) As alluded to above, the Court does not believe the evidence was insufficient to establish that Kelmendi's damages resulted from the retaliation. It is true that Kelmendi's testimony was often fanciful and contrary to most of the other witnesses, but those credibility issues were for the jury to resolve. So the Court finds that this is not an adequate basis for a new trial.

**3.**

Defendants' third argument builds on the first two. The argument is simply that the Court must strike the non-economic damages award because Defendants are entitled to judgment as a matter of law on Kelmendi's retaliation claim. (R. 108, PID 2740.) The Court has already declined to grant judgment as a matter of law as to Defendants on the retaliation claim, so this argument fails.

In support of their request for a new trial, Defendants argue:

[T]he non-economic damages award is against the great weight of the evidence, excessive and punitive in nature. Plaintiff failed to present any evidence

> supporting his alleged non-economic damages, other than his own subjective, self-serving, uncorroborated testimony. He never treated with a psychologist, psychiatrist, social work or counsel or any kind related to the alleged retaliation.

(R. 108, PID 2741.)

Contrary to Defendants' position, "emotional injury may be proved without medical support," and "[a] plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden" to prove damages for mental and emotional distress by "competent evidence." *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 485 (6th Cir. 2005) (citations omitted) (affirming $250,000 emotional distress award in an ADA case because "Moorer's own testimony, combined with that of his wife and his treating physician, constituted competent evidence of Moorer's severe emotional distress stemming from his termination").

"A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive." *Fuhr v. School Dist. of City of Hazel Park*, 364 F.3d 753, 761 (6th Cir. 2004) (quoting *Farber v. Massilon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990)). Thus, the Court is not free to discredit entirely Kelmendi's testimony about his emotional anguish simply because it is self-serving. While the Court questions Kelmendi's credibility on certain issues, he provided additional evidence to support the emotional suffering he faced during his lengthy period of unemployment. His treating physician—albeit not a mental health specialist—concurred that Kelmendi had suffered depression. Kelmendi also presented evidence that he was homeless for at least a period of time, an obviously troubling position to be in, especially for someone with a doctorate in education. Thus, given this evidence, and the scant briefing of the

issue by Defendants, the Court finds that the non-economic damages award of $250,000 is neither excessive nor against the great weight of the evidence.

* * *

Accordingly, the Court will deny Defendants' motion for judgment as a matter of law and alternative motion for a new trial.

## V.

Kelmendi has also moved for attorneys' fees, prejudgment interest, and post-judgement interest. (R. 111.)

## A.

The Court starts with the request for attorneys' fees. Both Title VII and ELCRA authorize the Court to award "reasonable" attorneys' fees to the prevailing party. *See* 42 U.S.C. § 2000e-5(k); Mich. Comp. Laws Ann. § 37.2802.[5]

"The trial court's initial point of departure, when calculating a 'reasonable' attorney fee, should be the determination of the fee applicant's 'lodestar,' which is the proven number of hours reasonably expended on the case by an attorney, multiplied by his court-ascertained reasonable hourly rate. . . . The trial judge may then, within limits, adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (Title VII). "Among the factors the district court may consider are

---

[5] "As both the Supreme Court and this circuit have noted, the standard for awarding attorneys' fees is essentially the same under § 1988 and § 2000e–5(k), as the provision for attorneys' fees under § 1988 was patterned after that in § 2000e–5(k)." *Virostek v. Liberty Twp. Police Dep't/Trustees*, 14 F. App'x 493, 510 (6th Cir. 2001) (citing cases). The Court notes this because many courts, including in some of the opinions cited herein, have used the case law under the two statutes interchangeably.

the twelve described in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974)."[6] *Perry v. AutoZone Stores, Inc.*, 624 F. App'x 370, 372 (6th Cir. 2015) (Title VII).

Kelmendi requests attorneys' fees of $213,238.99. (R. 111, PID 2809.) The Court does not understand this requested figure, as the documents submitted support a total of $211,826.25 in fees at most. In any event, Defendants seek an across-the-board 50 percent reduction of Kelmendi's requested award. While the Court agrees that reduction is necessary to make the fee award reasonable, the Court finds that more tailored reductions are appropriate.

## 1.

Starting with the hourly rates, Kelmendi seeks a fee award for the work performed by three sources: (1) his trial counsel, Leonard Mungo and his associate Francisco Lozano, (2) Avery Williams, who served as supporting counsel for Mungo, and (3) several lawyers from one of the two firms that represented Kelmendi for part of the case pretrial, Pitt, McGehee, Palmer & Rivers.

Courts generally look to the "prevailing market rates in the relevant community" to assess reasonable hourly rates. *See Blum v. Stenson*, 465 U.S. 886, 895 (1984) (addressing fees under 42 U.S.C. § 1988). With that in mind, Kelmendi has pointed to the Michigan State Bar's

---

[6] Those factors are: (1) "[t]he time and labor required"; (2) "[t]he novelty and difficulty of the questions"; (3) "[t]he skill requisite to perform the legal services properly"; (4) "[t]he preclusion of other employment by the attorney due to acceptance of the case" (5) "[t]he customary fee" (6) "[w]hether the fee is fixed or contingent"; (7) "[t]ime limitations imposed by the client or the circumstances"; (8) "[t]he amount involved and the results obtained"; (9) "[t]he experience, reputation, and ability of the attorneys"; (10) "[t]he 'undesirability of the case"; (11) "[t]he nature and length of the professional relationship with the client"; and (12) "[a]wards in similar cases." *Johnson*, 488 F.2d at 717–19; *see also Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989) ("The Johnson factors may be relevant in adjusting the lodestar amount, but no one factor is a substitute for multiplying reasonable billing rates by a reasonable estimation of the number of hours expended on the litigation.").

annual Economics of Law Practice Survey, which provides a host of prevailing market rate data. *See* https://www.michbar.org/file/pmrc/articles/0000151.pdf; (*see also* R. 111-5).

   *Trial counsel.* Kelmendi argues that a reasonable rate for his lead trial attorney, Leonard Mungo, is $400 per hour, while a reasonable rate for his associate, Francisco Lozano, is $150 per hour. (R. 111, PID 2826.) Mungo heads a small firm with an office in downtown Detroit, has practiced for 26 years, and has experience with employment discrimination cases like this one. (R. 111-6, PID 2868.) Lozano is his sole associate and had practiced for close to a year by the time of the trial. (R. 111-6, PID 2870.) According to the Michigan survey data, Mungo's requested rate of $400 would put him between the 75th and 95th percentiles for attorneys with 26 years of experience ($347–$500), at the 95th percentile of attorneys at two-attorney firms ($400), at the 75th percentile for attorneys with offices in downtown Detroit, and between the 75th and 95th percentiles for plaintiff-side employment attorneys ($330–$450). Lozano's requested rate of $150 would put him below the 25th percentile for associates ($175) and at the 25th percentile for attorneys with one to two years' experience ($150). The Court finds the requested hourly rates to be reasonable. Lozano's rate is at the low end of the prevailing market rate. Mungo's falls toward the higher end but is justified given the skill that he demonstrated at trial, the result he obtained, and his proven experience in employment discrimination matters (*see* R. 111, PID 8822 n.1).

   *Supporting counsel.* Kelmendi also offers that a reasonable rate for Avery Williams, Mungo's supporting counsel, is $250. Williams is the managing partner of Williams Acosta, PLLC, which he describes as a "full-service law firm located in Detroit." (R. 111-7, PID 2873.) Williams has experience in employment discrimination cases and has been practicing for over 35 years. (R. 111-7, PID 2873–74.) Based on the Michigan bar survey data, the requested rate of $250 for Williams is at the median for managing partner billing rates, the median for attorneys

41

with over 35 years of practice, and between the 25th percentile and median rate for attorneys with offices in Downtown Detroit ($195–$275). The Court thus finds the requested rate for Williams is within reason.

*Prior counsel.* Kelmendi also implicitly asks for the following hourly rates for the Pitt, McGehee attorneys who previously represented him prior to the trial: (1) $400 for Robert Palmer, (2) $400 for Beth Rivers, (3) $275 for Andrea Johnson, and (4) $225 for Rachael Kohl. While Kelmendi has submitted time records reflecting these rates, he has offered little briefing on the issue. (*See* R. 111-4.) Pitt, McGehee is an eight-attorney plaintiff-side employment firm based out of Royal Oak, Michigan. (R. 111-8, PID 2877.) Robert Palmer is a partner with over 35 years' experience as an attorney, including in employment discrimination cases. (R. 111-8, PID 2877.) Beth Rivers is also a partner at the firm, with just shy of 35 years' experience and has worked exclusively in the area of plaintiff-side employment law. (R. 111-8, PID 2881.)

The Michigan bar survey data suggest that, like with Mungo, $400 per hour is a reasonable rate for Palmer and Rivers. Palmer's requested rate of $400 falls been the median and 75th percentile for equity partners/shareholders ($310–$417), between the 75th and 95th percentiles for attorneys with more than 35 years' experience ($350–$525), between the 75th and 95th percentiles for attorneys at firms with eight attorneys ($325–$455), between the 75th and 95th percentiles for attorneys with offices in southern Oakland County, where Royal Oak is located ($325–$495), and between the 75th and 95th percentiles for plaintiff-side employment attorneys ($330–$450). Rivers' requested rate of $400 falls within the same ranges as Palmer's, with the exception that it falls within a different range for years' experience—the 75th to 95th percentiles for attorneys with 31 to 35 years' experience is $300–$515. These rates are justified given their experience, skill, and reputation.

But the Court finds that reductions are warranted for the requested rates for the Pitt, McGehee associates who worked on the case. Andrea Johnson was an associate at Pitt, McGehee and had roughly 5 years' experience for the brief time that she worked on Kelmendi's case. (R. 111-8, PID 2884.) Her requested rate of $275 is between the 75th and 95th percentiles for associates ($250–$320), and between the 75th and 95th percentiles for attorneys with three to five years' experience ($250–$317). Rachel Kohl worked on the case both as a contract attorney for Pitt, McGehee and as an associate with the firm following her graduation from law school in 2014. (R. 111-8, PID 2887.) She avers that her current rate is $225 per hour, but the Court is doubtful that that is the appropriate rate to use for the contract work she performed a year out of law school. *See Gonter v. Hunt Valve Co.*, 510 F.3d 610, 617 (6th Cir. 2007) (discussing district courts' discretion to use historic versus current rates); (R. 111-8, PID 2888). The requested rate of $225 would put her at the 75th percentile for associates with one to two years' experience. Awards at the requested rates for the associates would be too high in this case—Mungo's associate claims only $150 per hour and Avery, a managing partner with decades of experience, claims only $250. The Court thus finds that $150 is reasonable for Kohl's work and $200 is reasonable for Johnson's work.

To recap, the Court finds that the following rates are reasonable: $400 for Mungo, Palmer, and Rivers; $250 for Avery; $200 for Johnson; and $150 for Lozano and Kohl.

**2.**

The Court next turns to its calculation of the hours reasonably expended on the litigation. The Court notes that Kelmendi does not seek fees for the work performed by his first attorney of record, who initiated the case, or for any work in connection with the motion for fees.

*Trial counsel.* Kelmendi has submitted time records from Mungo's firm reflecting that Mungo spent 203 hours on the case while Lozano spent 132. (R. 111-2.) The requested fees are generally well-documented and reasonable, but the Court finds that two reductions are warranted.

First, in addition to the hourly compensation for Mungo, Kelmendi requests to add $1,000 per day for each of the trial days (a total of $9,000) for Mungo, as that is Mungo's customary billing practice. (R. 111-6, PID 2868; R. 111-2, PID 2839–40.) This would increase the effective hourly rate, and Kelmendi offers no support for the propriety of using this method to structure a fee award. So the Court will deduct $9,000 from the requested fees attributable to Mungo.

Second, the Court is troubled that Mungo and Lozano both billed only in quarter-hour increments, and the vast majority of their time entries—with only a handful of exceptions each—are rounded to a half or full hour. *See Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 849 (6th Cir. 2013) (holding that a court has discretion to discount for the use of quarter-hour billing increments). The Court will thus impose an across-the-board reduction of five percent to Mungo's and Lozano's hours. That reduction amounts to several minutes for every hour, which the Court finds sufficient to counter the likelihood that some hours involved rounding that led to slight over-billing while others did not. *See id.* ("Quarter-hour billing cannot mathematically warrant a fee reduction greater than 60% relative to tenth-of-an-hour billing, and in most cases district courts should apply much lower percentage reductions—the purpose is to counter over-billing, not punish the failure to use tenth-of-an-hour billing.").

Kelmendi's brief in support of his fee request seems to suggest that the Court should be generous with fees attributable to Mungo because of Kelmendi's own difficult personality. In the

brief, Mungo describes Kelmendi as an "uncontrollable and unpredictable client." (R. 111, PID 2821.) Mungo adds that he "was advised by colleagues that there would be great client control issues and to not take on" the case. (R. 111, PID 2827.) Especially after viewing Kelmendi's testimony, the Court has little reason to doubt these representations. While the undesirability of a case is a factor for consideration under *Johnson*, the Court does not take this to mean that the undesirability of a particular client's personality favors higher fees. That would create a perverse incentive for clients to be difficult. It is, after all, the client who is the prevailing party and thus entitled to attorneys' fees under Title VII, not the attorneys themselves. *See Soliman v. Ebasco Servs. Inc.*, 822 F.2d 320, 322–23 (2d Cir. 1987) (holding that because "prevailing party" in Title VII's fee shifting provision "refer[s] to plaintiff's entitlement to those fees, not the plaintiff's lawyer, . . . independent of his client, an attorney has no personal right to an award of statutory attorney's fees under 42 U.S.C. § 2000e–5(k)").

*Supporting counsel.* Kelmendi has also submitted time records from Avery Williams, Mungo's supporting counsel, reflecting that Williams spent 65.95 hours working on the case in the months surrounding the trial, mostly on pretrial filings. (R. 111-3.) The Court sees several issues warranting reduction for Williams' time.

First, like Mungo and Lozano, Williams documented his time in quarter-hour increments. So the Court will impose a five percent reduction to his time.

Second, much of Williams' time appears to be redundant with Mungo's and Lozano's. For instance, Williams appears to have billed primarily for researching and writing surrounding the motions *in limine*. But Mungo and Lozano both spent considerable time on such efforts as well. *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (holding that hours that are "excessive, redundant, or otherwise unnecessary" are not reasonably expendable). Moreover, Kelmendi

offers no explanation for why Williams' additional time on these efforts is reasonable and why his tasks could not have been performed by Mungo or Lozano. *See id.* at 437 ("[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.").

The third issue makes it difficult for the Court to know precisely how much time was redundant or unnecessary: Williams block-billed his time entries, so there is no way to know how much time was reasonably spent on discrete tasks. "[T]he documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 553 (6th Cir. 2008) (quoting *United Slate, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 n.2 (6th Cir.1984)). Thus, "[c]ourts in this circuit have reduced attorney fees on the basis of insufficient billing descriptions where . . . billing records lumped together time entries under one total so that it was impossible to determine the amount of time spent on each task." *Id.* (internal quotation marks and citations omitted); *see also Bell v. Prefix, Inc*., 784 F. Supp. 2d 778, 787 (E.D. Mich. 2011) ("In the Sixth Circuit, the law is clear that significant reductions in time are appropriate where block billing is used").

An August 9, 2016 entry for 8.5 hours illustrates the problems with Williams' block billing: "Review and revision of pretrial order; review and revision of verdict form; review and revision of miscellaneous statement; research for motions in limine; preparation of draft motions in Limine; receipt and review of emails from Mr. Lozano; emails to Mr. Lozano; phone conference Mr. Mungo; receipt and review of e-mailf [sic] from Mr. Mungo." (R. 111-3, PID 2849.) This entry is problematic because Williams apparently billed for numerous hours

surrounding the proposed final pretrial order, jury instructions, and verdict form. But given the initial condition of these materials, the Court had to request counsel to resubmit everything with substantial changes. That suggests the time billed may have been excessive. But the Court cannot determine to what extent these hours were excessive because of the block billing.

Without being able to determine whether his time was reasonably expended, the Court finds that a 40% percent reduction in his hours is appropriate: 5% to account for the quarter-hour increments and 35% due to the redundancy with Mungo's and Lozano's time, the lack of any explanation for why Williams' time was needed, and the block billing that obscures how much of this time was reasonably expended.

*Prior counsel.* As for the Pitt, McGehee attorneys, Kelmendi has provided documentation that those attorneys spent a total of 287.5 hours on the case. The Court finds that reduction of their time is warranted as well.

First, a portion of Pitt, McGehee's time—albeit a small one—was directed at their motion for withdrawal of counsel. It makes little sense to reward Kelmendi additional money just because he suffered a relationship breakdown with his counsel. *See Hensley*, 461 U.S. 424, 434 ("Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary*[.]" (emphasis in original)). The Court will thus deduct Kohl's 5.25 hours and Palmer's 4.25 hours apparently directed to withdrawal efforts. (*See* R. 111-4, PID 2857.)

Second, many of the time entries attributable to Kohl are too vague for the Court to determine whether the hours were reasonably expended. *See Imwalle*, 515 F.3d at 553. For instance, many of her entries say only "Meeting with [someone]" or "Email to [someone]." (R. 111-4, PID 2855–56.) Understandably time records submitted to the Court cannot reveal client confidences, but some further context would be necessary to

ensure that the time was reasonable. Numerous entries also say nothing more than "Edit facts" or "Draft facts." (R. 111-4, PID 2855–56.) Presumably this refers to the facts section of Kelmendi's response to Defendants' summary-judgment motion, but the Court cannot be sure. If so, such time would be excessive, as Kohl appears to have directed a total of 45.25 hours to drafting, editing, or reviewing the facts section of Kelmendi's summary judgment response alone. (R. 111-4, PID 2855–56.) This was not an overly complex case at the time Pitt, McGehee worked on it. It has since become more complex in light of the damages issues surrounding Kelmendi's subsequent social security claim. But during discovery, the case was a run-of-the-mill discrimination and retaliation case. It would be unreasonable to compensate for over a week of time simply to describe the factual issues in dispute—especially when numerous other hours were billed by Kohl and other Pitt, McGehee attorneys for reviewing, editing, and drafting the other portions of the brief outside of the facts section. Thus, to account for the vagueness of Kohl's entries, and the likely excessiveness of her time, the Court will deduct 10% of her hours.

Third, like the other attorneys representing Kelmendi, the Pitt, McGehee attorneys all billed in quarter-hour increments, and much of their work was rounded to full-hour increments. So the Court will impose the same five percent reduction across-the-board to the remaining time.

A final issue that warrants further reduction of the hours attributable to Pitt, McGehee, is their more limited role Kelmendi's success. Few cases address the propriety of awarding fees to a prevailing party for work done by a counsel who withdrew prior to trial. But the Court finds persuasive the guiding principle that the Fourth Circuit has articulated: "Serving as counsel of record at trial is not a prerequisite to the recovery of fees. The issue, simply, is whether services were performed which contributed to claimant's success in the lawsuit." *Mammano v. Pittston Co.*, 792 F.2d 1242, 1245 (4th Cir. 1986) (Title VII).

Here, while Pitt, McGehee neither initiated Kelmendi's case nor took it to trial, the firm undeniably contributed to at least some of Kelmendi's trial success. They conducted a substantial amount of discovery and drafted Kelmendi's final amended complaint. That complaint (R. 25) added Kelmendi's ultimately-successful retaliation claims, as the previously-operative amended complaint did not include Title VII, ADEA, or ELCRA retaliation claims (R. 3). The firm also avoided total summary judgment, enabling Kelmendi to proceed to trial. But the firm did not wish to proceed to trial, where Kelmendi ultimately prevailed. As their motion for withdrawal stated, the firm and Kelmendi "have diametrically opposed views on both settlement and trial strategy." (R. 58, PID 1276.) And during the times that Kelmendi was unrepresented following their withdrawal, he was adamant about his desire to go to trial.

Moreover, Pitt, McGehee's withdrawal inevitably led to more work on the case when Kelmendi's trial counsel took over. For instance, it appears that Mungo spent considerable time getting up to speed on the case prior to trial—discussing the case with Kelmendi in June and July 2016 for over 21 hours over two days and reviewing the file to identify issues for motions *in limine* for four hours. (*See* R. 111-2, PID 2836.) The Court believes it would be a windfall to Kelmendi to reward him fully for Pitt, McGehee's time when—had they stayed on—less time would have been spent on trial preparation.

Accordingly, the Court finds that a further 40 percent reduction of the remaining hours attributable to Pitt, McGehee is appropriate. This discount accounts for the fact that the firm did not ultimately pursue the means that lead to the significant results Kelmendi achieved, the trial. It also accounts for the additional time that Kelmendi's new attorneys had to spend getting ready for trial in Pitt, McGehee's absence. The awarded time attributable to the firm reflects the reality that while the bulk of Kelmendi's success is owed to Mungo, Pitt, McGehee still put the case in a

position to prevail at trial by shepherding the successful retaliation claim through summary judgment.

One final issue requires attention. Defendants' main reason for seeking a 50% reduction to the requested fees is that Kelmendi was successful on only some of his claims. The Court is unpersuaded this warrants any further reduction. "[A] court should not measure a plaintiff's success simply by using a ratio of successful claims to claims raised." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 822 (6th Cir. 2013). When assessing the reasonableness of fees for a plaintiff like Kelmendi who has been only partially successful, the Court addresses two issues: "(1) whether the claims on which the plaintiff failed to prevail were or were not related to the claims on which he or she succeeded, and (2) whether the plaintiff achieved a sufficient degree of success to render the hours reasonably expended a satisfactory basis for awarding attorney fees." *Imwalle*, 515 F.3d at 552 (citation omitted).

It is true that Kelmendi prevailed only on his retaliation claims—not his discrimination claims or other state-law employment claims initially raised. The Court granted summary judgment in Defendants' favor on Kelmendi's Title VII and ELCRA claims of sex discrimination and his age discrimination claim under ADEA. (R. 52, PID 1267.) The Court also granted summary judgment in favor of Defendants on Kelmendi's claims of a violation of Michigan public policy, retaliation and discrimination under Section 1981, and tortious interference with contractual or business expectancy, because Kelmendi conceded that dismissal was appropriate. (R. 52, PID 1248–49.) At trial, the jury rejected all of the other remaining age and national origin discrimination claims.

But Defendants ignore the controlling precedent that cuts against their position. Indeed, at the very least, Kelmendi's "discrimination and retaliation claims are related for the purpose of

awarding attorney fees." *Imwalle*, 515 F.3d at 555 (holding that successful retaliation claim was related to unsuccessful discrimination claim). And because the vast majority of the hours billed in this case related to these claims, no further reduction is warranted.

Moreover, the remaining unsuccessful state-law claims are also related to the retaliation claim. Kelmendi based the tortious interference claim on the same allegedly improper performance evaluations at the center of his retaliation claim. (*See* R. 25, PID 221.) The Michigan public policy claim—predicated on the theory that DPS retaliated against Kelmendi for filing a worker's compensation claim (*see* R. 25, PID 221)—is also related to Kelmendi's successful retaliation claim because of both the common core of facts and the "related legal theories." *Imwalle*, 515, F.3d at 555. Moreover, the Court finds that it would be inappropriate to penalize Kelmendi for not prevailing on the public policy, tortious interference, and Section 1981 claims: he voluntarily conceded dismissal of these claims during summary judgment, saving the Court substantial resources. Thus, the Court finds that no further reduction in hours is needed simply because Kelmendi prevailed only on his retaliation theory.

* * *

In sum, the Court finds that an amount of $141,888.50 reflects a reasonable fee for this case. The following table shows the Court's fee award compared to the requested award.

| Attorney | Hourly Rate | | Hours | | Rate (x) Hours | |
|---|---|---|---|---|---|---|
| | *Requested* | *Awarded* | *Requested* | *Awarded[7]* | *Requested* | *Awarded* |
| Mungo | $400 | $400 | 203 | 192.85 | $90,200 | $77,140 |
| Lozano | $150 | $150 | 132 | 125.4 | $19,800 | $18,810 |
| Williams | $250 | $250 | 65.95 | 39.57 | $16,487.50 | $9,892.50 |
| Palmer | $400 | $400 | 86.55 | 45.265 | $34,620 | $18,106 |
| Rivers | $400 | $400 | 15.25 | 8.3875 | $6,100 | $3,355 |
| Johnson | $275 | $200 | 56.5 | 31.075 | $15,537.50 | $6,215 |
| Kohl | $225 | $150 | 129.25 | 55.8 | $29,081.25 | $8,370 |
| **Total** | | | | | $211,826.30 | $141,888.50 |

**B.**

Kelmendi's fee motion also notes in his "statement of issues presented" that one of the issues in the motion is his entitlement to costs. (R. 111, PID 2814.) But the motion makes no argument concerning costs. Defendants nevertheless raised several issues with Kelmendi's separately-filed bill of costs (R. 110) in their response to Kelmendi's fee motion. In reply, Kelmendi simply says those criticisms are "bogus." (R. 116, PID 3103.) To the extent Kelmendi's motion seeks costs, it is denied, as he has failed to argue the issue. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").

As for Defendants' criticisms to the bill of costs, their response to Kelmendi's fee motion challenges the validity of taxing costs stemming from the depositions of deponents exclusively

---

[7] Formulas for the awarded hours are as follows. Mungo: requested hours, reduced by 5% (excludes the $9,000 in trial fees); Lozano: requested hours, reduced by 5%; Williams: requested hours, reduced by 40%; Palmer: requested hours minus 4.25 hours, reduced by a total of 45%; Rivers: requested hours, reduced by a total of 45%; Johnson: requested hours, reduced by a total of 45%; Kohl: requested hours minus 5.25 hours, reduced by a total of 55%.

related to Kelmendi's unsuccessful discrimination claim (Ivezaj, Ridgeway, and Rebeca Luna) and costs from Pitt, McGehee's motion for withdrawal of counsel. (R. 114, PID 3038.) It does not appear from the docket that the Clerk of the Court has taxed costs yet. Even if the Clerk had, a response brief to an unrelated motion is not the appropriate vehicle to challenge the bill of costs. As this District's Bill of Costs Handbook provides, "After the taxation clerk has taxed costs, counsel for either side may, within seven days, file a motion to review the action of the taxation clerk and request review by the Court." *See https://www.mied.uscourts.gov/PDFFIles/BillofCostsHandbook.pdf.* Thus, the Court will not further consider this issue at this time.

## C.

Kelmendi next seeks prejudgment interest on all of his damages at the Michigan prejudgment interest statutory rate under Mich. Comp. Laws § 600.6013, totaling $112,120.88. The Court notes that Defendants do not object to using the Michigan statutory interest rate, and at least one other court has recently applied it in a case with both Title VII and ELCRA claims. *See O'Brien v. City of Benton Harbor*, No. 1:14-CV-598, 2017 WL 700214, at *7 (W.D. Mich. Feb. 22, 2017). Instead, Defendants offer certain arguments as to why prejudgment interest is unwarranted for specific segments of Kelmendi's damages.

As the Court will vacate the award of front pay, Kelmendi is not entitled to prejudgment interest on that award.

As for back pay, the Sixth Circuit has explained, "An award of prejudgment interest . . . is an element of complete compensation in a Title VII back pay award" because it "helps to make victims of discrimination whole and compensates them for the true cost of money damages they incurred." *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 841–42 (6th Cir.

1994) (citations omitted). Defendants argue that Kelmendi is not entitled to prejudgment interest because the back pay award is "excessive without baseless [sic]." (R. 113, PID 2997.) Despite the concerns expressed above about the back pay award, this is not the appropriate place for Defendants to attack the jury's calculation of the award or the evidentiary basis for it. Defendants' brief remark on this is insufficient to prompt the Court to make any additional findings as to the award's excessiveness. So the Court will not preclude prejudgment interest on the back pay award entirely.

The same goes for non-economic damages. Defendants suggest that the Michigan prejudgment interest statute precludes prejudgment interest awards on all non-economic damages. Specifically, Mich. Comp. Laws § 600.6013(1) provides: "for complaints filed on or after October 1, 1986, interest is not allowed on future damages from the date of filing the complaint to the date of entry of the judgment." Section 6013(1) points to Section 6301 for the definition of "future damages." Section 6301(a) defines future damages as "damages arising from personal injury which the trier of fact finds will accrue after the damage findings are made and includes damages for medical treatment, care and custody, loss of earnings, loss of earning capacity, loss of bodily function, and pain and suffering." Section 6301(b) adds that "personal injury" "means bodily harm, sickness, disease, death, or emotional harm resulting from bodily harm." This does not convince the Court that prejudgment interest is entirely inappropriate for Kelmendi's award of non-economic damages. Nothing in the jury's instructions on non-economic damages limited the jury's findings to harm Kelmendi would suffer in the future. Rather, the instruction expressly allowed for "damages for embarrassment, humiliation, and mental anguish that you decide *have been sustained by Plaintiff to the present time*." (R. 96, PID

1824.) Moreover, this is not a case where the damages "result[ed] from bodily harm." The damages flowed instead from the retaliation, or so the jury found.

Still, this case has gone on for many years, and the Court may exclude prejudgment interest for any period of delay attributable to Kelmendi. *See Shore v. Fed. Exp. Corp.*, 42 F.3d 373, 380 (6th Cir. 1994). A substantial portion of the delay was attributable to him. Discovery was initially due in this case on November 21, 2013. (R. 9.) But several weeks beforehand, Kelmendi's first counsel withdrew because of a breakdown in the attorney-client relationship (*see* R. 15), so the Court modified the existing scheduling order, pushing back many dates by close to two months. (R. 16.) Delays in Kelmendi's discovery responses—and an ensuing motion to compel filed by Defendants—led to a further extension of the discovery deadline by another seven months. (*See* R. 20, 21.) The Court then extended discovery another month after Kelmendi finally obtained new counsel, Pitt, McGehee. (R. 32.) Thus, the Court finds that Kelmendi is not entitled to prejudgment interest from November 21, 2013 (the initial discovery cut-off) until September 30, 2014 (the revised discovery cut-off following the delays)—just over 10 months.

After the Court ruled on Defendants' summary-judgment motion in July 2015 and the parties attended a settlement conference, the case was ready to proceed to trial, and the Court set a January 19, 2016 trial date. (R. 61.) But Kelmendi's health issues and attorney problems caused further delay. The Court permitted Pitt, McGehee to withdraw after the firm cited another breakdown in the attorney-client relationship (R. 60), and the Court set a new trial date for March 2016 so that Kelmendi could obtain new counsel (R. 64). Kelmendi later moved to adjourn that date, citing his health. (R. 70.) This resulted in a delay of another six months until the case was ultimately tried in September 2016. (R. 72.) So the Court also finds that Kelmendi is not entitled to prejudgment from January 19, 2016 (the trial date set before counsel withdrew)

until September 12, 2016 (the trial date set in light of Pitt, McGehee's withdrawal and Kelmendi's health issues)—roughly nine months.

Thus, for the non-excluded periods of time from when Kelmendi filed his complaint in November 2012 until the time of judgment in October 2016, the Court finds that Kelmendi is entitled to prejudgment interest at the applicable statutory rates under Mich. Comp. Laws § 600.6013. This does not apply to the front pay award, which the Court will vacate.

**D.**

Kelmendi finally requests post-judgment interest at a rate of 0.61%. (R. 111, PID 2830.) Defendants do not dispute this.

Title 28 U.S.C. § 1961(a) provides that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [sic] the date of the judgment." Such interest is mandatory. *See Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 586 (6th Cir. 2002). It runs from the date of the judgment, not the jury's verdict. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 835 (1990). Here, the Court entered judgment on October 27, 2016. (R. 107.) The Court takes judicial notice that the appropriate interest rate for the week preceding the date of judgment is 0.66%, not the 0.61% that would apply if post-judgment interest ran from the jury's verdict. *See*, *e.g.*, *http://www.utd.uscourts.gov/documents/int2016.html* (noting the applicable post-judgment interest rate for each week ending in 2016). Accordingly, Kelmendi is entitled to post-judgment interest at a rate of 0.66%, starting from October 27, 2016.

## VI.

For the reasons discussed, IT IS ORDERED that Defendants' Renewed Motion in Limine to Bar Any Claim for Back Pay And/Or Front Pay Damages (R. 92) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED to the extent that the jury's award for $152,400 for front pay is VACATED. The motion is DENIED in all other respects.

IT IS FURTHER ORDERED that Defendants' Oral Motion for Judgment as a Matter of Law is DENIED.

IT IS FURTHER ORDERED that Defendants' for Judgment as a Matter of Law or, in the Alternative, for a New Trial (R. 108) is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Attorney Fees (R. 111) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED to the extent that Plaintiff is AWARDED the following: (1) $141,888.50 in attorneys' fees; (2) post-judgment interest at a rate of 0.66%; and (3) pre-judgment interest at the appropriate rate under Mich. Comp. Laws § 600.6013, excluding both the vacated front pay award and time periods from November 21, 2013 until September 30, 2014 and January 19, 2016 until September 12, 2016. The motion is DENIED in all other respects.

A separate amended judgment will issue.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: April 27, 2017                    U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 27, 2017.

s/Keisha Jackson
Case Manager